**UNITED STATES of America,
Plaintiff,**

v.

**Thomas M. SCHNEPPER
(1), Defendant.**

**No. CR. 02–00062 ACK.**

United States District Court,
D. Hawai'i.

Jan. 13, 2004.

As Amended Feb. 18, 2004.

William M. Domingo, Office of the Fed. Public Defenders, Richard S. Kawana, Honolulu, HI, for Thomas M. Schnepper (1), defendant.

Michael A. Rotker, Lawrence L. Tong, Office of the United States Attorney, Honolulu, HI, for U.S

### ORDER DENYING DEFENDANT'S MOTION TO IMPOSE SENTENCE WITHOUT REFERENCE TO THE SENTENCING GUIDELINES

KAY, District Judge.

### INTRODUCTION

The so-called "Feeney Amendment," Title IV of the Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003 ("PROTECT Act"), Pub.L. No. 108–21, 117 Stat. 650 (2003), supplements the Sentencing Reform Act of 1984 ("Reform Act"), 18 U.S.C. §§ 3551–3742 and 28 U.S.C. §§ 991–998, by imposing further constraints and, as many commentators have noted, burdensome tasks on the Judiciary. But it is not for the Court to question the wisdom of our federal sentencing scheme as a matter of policy, nor to reexamine the correctness of *Mistretta v. United States,* 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). The Court's important but limited function is to determine whether Title IV violates the United States Constitution. More precise-

ly, the Court must decide whether Title IV creates a sentencing system so unlike that approved of in *Mistretta* as to render the entire United States Sentencing Commission Guidelines Manual ("Guidelines Manual") unconstitutional. For the following reasons, the Court concludes that Title IV does not transgress the borders approved of in *Mistretta*.

## BACKGROUND

### I. *Factual and Procedural History*

On June 6, 2003, a jury found Defendant Thomas M. Schnepper guilty of five counts of using the internet, a facility and means of interstate commerce, to knowingly attempt to transfer obscene material in violation of 18 U.S.C. § 1470 and one count of using the internet, a facility and means of interstate commerce, to knowingly attempt to persuade, induce and entice an individual less than eighteen years of age to engage in sexual activity in violation of 18 U.S.C. § 2422(b).[1]

On September 18, 2003, Schnepper moved to Impose Sentence Without Reference to the Sentencing Guidelines Because the Guidelines Have Been Rendered Unconstitutional By the "PROTECT" Act ("Defendant's Motion").[2] The United States of America ("Government") filed its Memorandum in Opposition to Defendant's Motion ("Memo in Opp.") on October 30, 2003. Schnepper replied on November 14, 2003.[3] The Court heard argument on December 18, 2003.[4]

### II. *Legal History*

#### A. The Sentencing Reform Act of 1984

The Sentencing Reform Act of 1984 "revolutionized the manner in which district courts sentence persons convicted of federal crimes."[5] *Burns v. United States*, 501 U.S. 129, 132, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991). Prior to the Reform Act, an indeterminate sentencing system largely prevailed. That is, Congress set the minimum and maximum penalties for federal crimes but otherwise left sentencing judges with discretion to determine the appropriate punishment in individual

---

1. On June 3, 2003, the Court dismissed Count 8, knowingly transporting in interstate commerce a visual depiction the production of which involved the use of a minor engaged in sexually explicit conduct, because the evidence established that the alleged minor was in fact not under eighteen years of age at the time the image was produced. In addition, the jury found Schnepper not guilty on Count 6, a count of using the internet, a facility and means of interstate commerce, to knowingly attempt to transfer obscene material in violation of 21 U.S.C. § 843(b). On June 16, 2003, the Court entered Judgment of Acquittal in Schnepper's favor as to Count 6.

2. On September 15, 2003, Schnepper filed a Motion for Downward Departure. The Motion offers a number of grounds for imposing a sentence below the range recommended by the Guidelines Manual but is otherwise consistent with the federal sentencing system. This Order references Schnepper's Motion for Downward Departure only to the extent that the Motion informs the Ex Post Facto

Clause discussion. *See infra* Discussion I. The Court will address the merits of Schnepper's Motion for Downward Departure by separate order.

3. Schnepper joined Defendant Jon Kevin Morris' Reply Memorandum ("Morris' Reply"), filed November 12, 2003. Like Schnepper, Morris challenges the Guidelines Manual on constitutional grounds.

4. At the Government's request, the hearing on Defendant's Motion was consolidated with hearings on identical motions brought by Morris and Defendant Kil Soo Lee, before the Honorable Helen Gillmor and the Honorable Susan Oki Mollway, respectively.

5. To avoid confusion, the Court will cite to the relevant section of the United States Code when discussing the Reform Act, including pre-PROTECT Act amendments, and to Title IV of the PROTECT Act as Pub.L. No. 108–21, § 401, et seq.

cases. *See, e.g.,* Judge Stanley A. Weigel, *The Sentencing Reform Act of 1984: A Practical Appraisal,* 36 UCLA L.Rev. 83, 86 (Fall 1988).

Dissatisfied with perceived disparities in the sentences actually imposed,[6] Congress created the United States Sentencing Commission ("Commission"), a permanent, "independent commission in the judicial branch of the United States," 28 U.S.C. § 991(a).[7] Congress tasked the Commission with establishing policies and practices to provide "certainty and fairness" in sentencing. 28 U.S.C. §§ 991(b)(1), 991(b)(1)(B). To that end, the Reform Act directed the Commission to "promulgate and distribute to all courts of the United States and to the United States Probation System," *inter alia,* "guidelines for the use of the sentencing court in determining the sentence to be imposed in a criminal case ...."[8] 28 U.S.C. §§ 994(a)-(a)(1). This directive resulted in the Guidelines Manual, first issued in October 1987. Weigel, *supra,* at 85.

To ensure successful implementation of the Guidelines Manual, Congress established a detailed data compilation system. Most notably, the Reform Act empowered the Commission to monitor judicial sentencing practices and to amend the range of permissible sentences as necessary. *See* 28 U.S.C. §§ 994(m)-(p), 995(a). To assist the Commission in this function, Congress imposed certain reporting requirements on sentencing courts.[9] 28 U.S.C. § 994(w). Not to be left out, the Reform Act also directed the Commission to provide Congress, "at least annually," with a detailed analysis of sentencing practices.[10] *Id.*

Under the system created by the Reform Act, Congress continued to set the minimum and maximum penalties, but the Commission, through its Guidelines Manual, regulated judicial discretion by establishing a narrow range of permissible sentences between the statutory boundaries. *See Koon v. United States,* 518 U.S. 81, 92, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996); Wilkins, et al., *supra,* at 369–70; Weigel,

---

**6.** For a discussion of pre-Reform Act disparity in sentencing and Congress' reaction to the same, see Judge William K. Wilkins, Jr., et al., *The Sentencing Reform Act of 1984: A Bold Approach to the Unwarranted Sentencing Disparity Problem,* 2 Crim. L.F. 355, 358–65 (Winter 1991); Julia L. Black, *The Constitutionality of Federal Sentences Imposed Under the Sentencing Reform Act of 1984 After Mistretta v. United States,* 75 Iowa L.Rev. 767, 769–74 (1990).

**7.** Congress formed the Commission with seven voting members and two ex officio, nonvoting members. 28 U.S.C. § 991(a). Congress also directed that the

President ... shall appoint the voting members of the Commission, by and with the advice and consent of the Senate .... At least three of the members shall be Federal judges selected after considering a list of six judges recommended to the President by the Judicial Conference of the United States. Not more than four of the members

of the Commission shall be members of the same political party.

28 U.S.C. § 991(a).

**8.** The Reform Act specified certain factors, such as the nature of the offense and the criminal history of the offender, to be considered in establishing the sentencing guidelines. *See* 28 U.S.C. §§ 994(c)–994(n).

**9.** Section 994(w) provides:

The appropriate judge or officer shall submit to the Commission in connection with each sentence imposed ... a written report of the sentence, the offense for which it is imposed, the age, race, and sex of the offender, information regarding factors made relevant by the guidelines, and such other information as the Commission finds appropriate.

28 U.S.C. § 994(w).

**10.** For a discussion of the purpose of and approach to the Commission's reporting task, see Wilkins, et al., *supra,* at 377–79.

*supra,* at 86, 89. Sentencing courts were left to select a sentence from the guideline ranges and authorized to depart therefrom only for the reasons stated in the Guidelines Manual or in "significantly atypical cases," Wilkins, et al., *supra,* at 369, that is, where

> "the court finds that there·exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the [Commission] in formulating the guidelines that should result in a sentence different from that described." To determine whether a circumstance was adequately taken into consideration, the Congress instructed courts to "consider only the sentencing guidelines, policy statements, and official commentary of the [Commission]."

*Koon,* 518 U.S. at 92–93, 116 S.Ct. 2035 (quoting 18 U.S.C. § 3553(b)) (citations omitted).

In the event of a departure, the Reform Act directed the sentencing judge to state "the specific reason" for imposing a sentence different from that described in the guidelines. 18 U.S.C. § 3553(c). To ensure thorough vetting of any departure, Defendants were given the right to appeal sentences above the defined range, while the government was authorized to appeal sentences below that range. 18 U.S.C. §§ 3742(a)-(b). The Reform Act empowered both sides to appeal an incorrect application of the Guidelines Manual. *Id.*

### B. *Mistretta v. United States*

Predictably, criminal defendants challenged the Reform Act in cases across the country. Weigel, *supra,* at 87. In *Mistretta v. United States,* the Court, by an eight to one vote, upheld the Commission and the Guidelines Manual as constitutional.[11]

*Mistretta* addressed two important questions: first, whether the Reform Act amounted to an unconstitutional delegation of legislative authority; and, second, whether the Reform Act violated the principle of separation of powers by encroaching upon or aggrandizing the powers of the Judicial Branch.[12]

#### 1. *Delegation*

Taking the delegation issue first, the Court reasoned that placement of the legislative power in "a Congress of the United States," U.S. Const. art. I, § 1, did "not prevent Congress from obtaining the assistance of its coordinate branches." *Mistretta,* 488 U.S. at 372, 109 S.Ct. 647. This conclusion was driven by the "practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Id.* at 372, 109 S.Ct. 647. That being so, extending what appeared to be legislative power to another Branch was therefore permissible so long as "Congress clearly delineate[d] the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *Id.* at 372–73, 109 S.Ct. 647. In short, Congress need only provide an "intelligible principle" to guide the delegatee. *See id.* at 373, 109 S.Ct. 647.

---

11. Justice Scalia issued a powerful dissenting opinion but failed to persuade his fellow members. This strong showing in the Supreme Court does not accurately reflect the substantial controversy surrounding the constitutionality of the Reform Act before *Mistretta,* however. Indeed, the court in *United States v. Whyte,* 694 F.Supp. 1194 (E.D.Pa. 1988), noted that while 106 courts had upheld the Reform Act, 145 had struck the measure down as unconstitutional. *Id.* at 1194 n. 1

12. Because of its obvious similarity to this case, *Mistretta* is recounted in detail.

The Court had little difficulty finding an intelligible principle in the Reform Act. Specifically, the Court concluded that Congress had (1) clearly articulated its goals; (2) designated a particular public agency—the Commission—to act; (3) developed a specific tool—the sentencing guidelines—to accomplish Congress' purpose; and (4) directed the public agency to consider numerous factors when performing its function. *Mistretta,* 488 U.S. at 374–76, 109 S.Ct. 647. In other words, the Reform Act "outlin[ed] the policies which prompted the establishment of the Commission, explain[ed] what the Commission should do and how to do it, and set[ ] out specific directives to govern particular situations." *Id.* at 379, 109 S.Ct. 647 (quoting *United States v. Chambless,* 680 F.Supp. 793, 796 (E.D.La.1988)). This complete and detailed directive easily satisfied the nondelegation doctrine.

The Court paused only briefly to acknowledge the Commission's broad discretion in formulating sentencing guidelines, including the power to determine "which crimes have been punished too leniently, and which too severely." *Mistretta,* 488 U.S. at 377–78, 109 S.Ct. 647. Such discretion, according to the Court, was not a constitutional infirmity because "delegations of this type may . . . carry with them the need to exercise judgment on matters of policy." *Id.* at 378, 109 S.Ct. 647.

### 2. *Separation of Powers*

Turning to the separation of powers issue, the Court held that the Reform Act did not "upset the constitutionally mandated balance of powers among the coordinate Branches." *Mistretta,* 488 U.S. at 412, 109 S.Ct. 647. This result followed from a flexible and functional understanding of the Constitution's structure.

That is, although "the Constitution diffuses power the better to secure liberty, it also contemplates that practice will inte-grate the dispersed power into a workable government." *Mistretta,* 488 U.S. at 381, 109 S.Ct. 647 (quoting *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635, 72 S.Ct. 863, 96 L.Ed. 1153 (1952)). Accordingly, caution against "encroachment or aggrandizement" of a particular Branch, rather than "a hermetic division among the Branches," informs separation of powers jurisprudence. *See id.* at 381–82, 109 S.Ct. 647. In cases involving the Judicial Branch, this functional analysis ensures that the Judiciary is neither "assigned nor allowed 'tasks that are more properly accomplished by [other] Branches,' and . . . . that no provision of law 'impermissibly threatens the institutional integrity of the Judicial Branch.'" *Id.* at 383, 109 S.Ct. 647 (citations omitted) (alteration in original).

Guided by this flexible analytical structure, the Court first examined the location of the Commission. The Court acknowledged that the Commission was a peculiar institution, but concluded that "Congress' decision to create an independent rulemaking body to promulgate sentencing guidelines and to locate that body within the Judicial Branch is not unconstitutional unless Congress has vested in the Commission powers that are more appropriately performed by the other Branches or that undermine the integrity of the Judiciary." *Mistretta,* 488 U.S. at 385, 109 S.Ct. 647.

The powers exercised by the Commission were appropriate for the Judicial Branch because Congress may assign "to the courts or auxiliary bodies within the Judicial Branch administrative or rulemaking duties that . . . are 'necessary and proper . . . for carrying into execution all the judgments which the judicial department has power to pronounce.'" *Mistretta,* 488 U.S. at 389, 109 S.Ct. 647 (quoting *Wayman v. Southard,* 23 U.S. (10 Wheat) 1, 22, 6 L.Ed. 253 (1825)). Determining

the appropriate punishment for federal crimes, essentially the function of the Commission, had long been a "shared responsibility among the Branches of Government" and not "the exclusive constitutional province" of a single Branch. *Id.* at 390, 109 S.Ct. 647. Indeed, the "role of the Commission in promulgating guidelines" was found to be akin to formulating rules of procedure pursuant to various enabling Acts. *Mistretta,* 488 U.S. at 391, 109 S.Ct. 647. Sentencing guidelines, also the result of a joint effort by Congress and the courts, were binding just as rules of procedure were binding. *Id.* For the Court, the obvious substantive and political nature of establishing penalties for federal crimes did not destroy the analogy. *See id.* at 392–93, 109 S.Ct. 647.

Nor were the powers of the Commission "united with the powers of the Judiciary in a way that ha[d] meaning for separation-of-powers analysis." *Mistretta,* 488 U.S. at 393, 109 S.Ct. 647. The Court observed that the Commission "is not a court, does not exercise judicial power and is not controlled by or accountable to members of the Judicial Branch." *Id.* The Court instead viewed the Commission as designated: an independent body "on which judges, potentially a minority," served subject to "the President's limited powers of removal." *Id.* at 394, 109 S.Ct. 647.

Furthermore, prior to the passage of the Reform Act,

> the Judicial Branch, as an aggregate, decided precisely the questions assigned to the Commission: what sentence is appropriate to what criminal conduct under what circumstances. It was the every day business of judges, taken collectively, to evaluate and weigh the various aims of sentencing and to apply those aims to the individual cases that came before them.

*Mistretta,* 488 U.S. at 395, 109 S.Ct. 647. That being so, the Reform Act merely

"fetter[ed] the discretion of sentencing judges to do what they ha[d] done for generations—impose sentences within the broad limits established by Congress." *Id.* at 396, 109 S.Ct. 647. Combining the roles of substantive judgment in the field of sentencing and rulemaking in a single body was, therefore, entirely consistent with the powers of the Judicial Branch. *See id.*

Having determined that the Commission did not exercise authority more appropriate to another Branch, the Court turned its attention to the integrity of the Judiciary. In particular, the Court examined whether requiring the service of federal judges on the Commission or allowing for a limited presidential power of removal undermined the Judicial Branch.

As to the service of federal judges, the Court, following a lengthy discussion of history and precedent, concluded that neither the text of the Constitution nor practice prevented Article III judges from undertaking extrajudicial duties. *Mistretta,* 488 U.S. at 396–404, 109 S.Ct. 647. The Court recounted numerous examples (dating from the founding generation) of judges accepting appointments for and serving in capacities of a nonjudicial nature. *See id.* Although not without some cause for concern, serving as a member of the Commission, a voluntary undertaking, largely followed along these historical lines. *See id.* at 405–07, 109 S.Ct. 647. The "participation of federal judges" on the Commission thus did not threaten, either in fact or appearance, "the impartiality of the Judicial Branch." *Id.* at 407, 109 S.Ct. 647.

Nor did the service of nonjudges on the Commission impair the power of federal judges. The Court reiterated that "the Commission is not a court and exercises no judicial power." *Mistretta,* 488 U.S. at 408, 109 S.Ct. 647. That being so, the Reform Act did not "vest Article III power

in nonjudges or require Article III judges to share their power with nonjudges." *Id.*

Regarding the removal power, the Court recognized that the President enjoys substantial authority over the composition of the Commission, including the power to appoint all seven voting members (with the advice and consent of the Senate) and the power to remove members for "neglect of duty or malfeasance in office or for other good cause shown." *Mistretta*, 488 U.S. at 409, 109 S.Ct. 647 (quoting 28 U.S.C. § 991(a)). Clearly untroubled that such power would interfere with the functioning of an independent Judiciary, the Court dismissed the appointment concern as "fanciful" and the removal power as a "negligible threat." *Id.* at 409–10, 109 S.Ct. 647. The Court simply could not "imagine that federal judges will comport their actions to the wishes of the President for purposes of receiving an appointment" to the Commission. *Id.* at 410, 109 S.Ct. 647. Moreover, the limitations on the removal power were adequate "to prevent the President from exercising 'coercive influence' over independent agencies." *Id.*

### 3. *Holding*

For the foregoing reasons, the Court held "that in creating the [Commission]—an unusual hybrid in structure and authority—Congress neither delegated excessive legislative power nor upset the constitutionally mandated balance of powers among the coordinate Branches." *Mistretta*, 488 U.S. at 412, 109 S.Ct. 647. The structural foundations of the Constitution allowed Congress to delegate "to an expert body located within the Judicial Branch the intricate task of formulating sentencing guidelines consistent with the significant statutory direction" and to call "upon the accumulated wisdom and experience of the Judicial Branch in creating policy on a matter uniquely within the ken of judges." *Id.*

### C. Title IV of the PROTECT Act

Title IV alters the Reform Act in several important ways.[13] First, §·401(a) amends 18 U.S.C. § 3553(b) by limiting the availability of downward departures for certain child crimes and sexual offenses. PROTECT Act, Pub.L. No. 108–21, § 401(a); *United States v. VanLeer*, 270 F.Supp.2d 1318, 1323 (D.Utah 2003). Section 401(b) amends the Guidelines Manual to reflect the revisions to § 3553(b).[14] PROTECT Act, Pub.L. No. 108–21, § 401(b).

Second, § 401(j) provides that the Commission may not add a new ground for departure or take any action that is inconsistent with the limitations expressed in § 401(b) on or before May 1, 2005. PROTECT Act, Pub.L. No. 108–21, § 401(j)(2).

Third, § 401(m) instructs the Commission to generally "ensure that the incidents of downward departures are substantially reduced" and to promulgate "appropriate

**13.**· The PROTECT Act, passed partly in response to *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002), was introduced in the Senate on January 13, 2003, Cong. Rec. S230 (daily ed. Jan. 13, 2003), and in the House by a related bill on March 5, 2003, Cong. Rec. H1641 (daily ed. March 5, 2003). As introduced, the PROTECT Act essentially modified certain provisions of the criminal Code relating to child pornography. *See generally* Joseph J. Beard, *Virtual Kiddie Porn: A Real Crime? An Analysis of the PROTECT Act*, 21 Ent. & Sports Law 3 (Summer 2003) (discussing the PROTECT Act). Representative Feeney, however, introduced what became Title IV as an amendment to the PROTECT Act on March 27, 2003. .H.R.Rep. No. 108–48, at 42 (2003). Title IV eventually passed Congress, without input from the Judiciary, in its current form as part of the PROTECT Act and was signed into law by the President on April 30, 2003.

**14.** The Commission implemented these changes and, as directed by § 401(j)(1), distributed the amendments in a Supplement to the 2002 Guidelines Manual on April 30, 2003.

amendments to the sentencing guidelines ... [and] any other conforming amendments ... necessitated by" the PROTECT Act.[15] PROTECT Act, Pub.L. No. 108–21, § 401(m)(2)(A)-(B).

■ Fourth, § 401(c) supplements the requirement that the sentencing judge state in open court "the specific reason for the imposition of a sentence different from that described" in the sentencing guidelines, 18 U.S.C. § 3553(c)(2), by further directing that the reasons for departure be described "with specificity in the written order of judgment and commitment," PROTECT Act, Pub.L. No. 108–21, § 401(c)(1).[16]

Fifth, § 401(d) modifies appellate review of departures from the Guidelines Manual, 18 U.S.C. § 3742(e), to, *inter alia,* reflect the acceptable grounds for departure expressed in § 401(a). PROTECT Act, Pub.L. No. 108–21, § 401(d)(1). Section 401(d) also establishes a de novo standard of review for the "district court's application of the guidelines to the facts" of the case. PROTECT Act, Pub.L. No. 108–21, § 401(d)(2). The latter change effectively overrules the abuse of discretion standard recognized in *Koon,* 518 U.S. at 100, 116 S.Ct. 2035. *See United States v. Leon,* 341 F.3d 928, 931 (9th Cir.2003).

Sixth, § 401(h) enhances the data collection methods of 28 U.S.C. § 994. In particular, § 401(h)(1) tasks the Chief Judge of each district with the obligation to en-sure that sentencing courts timely report to the Commission and further details the information to be included. PROTECT Act, Pub.L. No. 108–21, § 401(h)(1). The Commission's duty to provide Congress with an annual analysis of sentencing reports remains unchanged, except that the Commission must now include "an accounting of those districts that the Commission believes have not submitted the appropriate information and documents required by this section." *Compare* 28 U.S.C. § 994(w) *with* PROTECT Act, Pub.L. No. 108–21, § 401(h)(3). As a new data collection provision, the Commission is to make, upon request, the sentencing reports and all underlying records available to the House and Senate Committees on the Judiciary, PROTECT Act, Pub.L. No. 108–21, § 401(h)(2), and to provide the Attorney General with "such data files as the Commission may assemble or maintain in electronic form that include any information" contained in the sentencing reports, § 401(h)(4).

Seventh, § 401(l) directs the Attorney General to submit a report to the Senate and House Judiciary Committees detailing the "policies and procedures that the Department of Justice has adopted subsequent to the enactment of" Title IV not more than ninety days after the enactment of the PROTECT Act. PROTECT Act, Pub.L. No. 108–21, §§ 401(l)(1), 401(l)(3). The Attorney General complied with this provision on July 28, 2003.[17] Ex. 4 to

---

**15.** On October 8, 2003, the Commission adopted an emergency amendment, effective October 27, 2003, to implement the PROTECT Act directives. The 2003 Guidelines Manual, which incorporated the changes made by the emergency amendments and the regularly scheduled amendments, became effective on November 5, 2003.

**16.** "A denial of a downward departure is generally non-reviewable unless the lower court's failure to depart stemmed from a misapprehension of its authority under the sentencing guidelines. This standard is unaffected by the PROTECT act, which applies when the decision made is to grant a departure." *United States v. Soto–Beniquez,* No. 01–1619, et al., 2004 WL 102442, at *45 (1st Cir. Nov. 20, 2003), 2003 U.S.App. Lexis 23655, at *123 (citations omitted).

**17.** A separate reporting requirement would have taken effect in the event the Attorney General determined not to submit the report discussed above. PROTECT Act, Pub.L. No. 108–21, §§ 401(l)(2)-(3); *infra* Discussion IV.

Government's Appendix in Support of Opposition to Defendant's Motion ("Government's Appdx.").

Finally, § 401(n)(1) potentially alters the composition of the Commission by replacing the phrase "[a]t least three of the members shall be Federal judges," 28 U.S.C. § 991(a), with the phrase "[n]ot more than three of the members shall be Federal Judges," PROTECT Act, Pub.L. No. 108–21, § 401(n)(1). This change does not apply, however, to "any person who is serving, or has been nominated to serve, as a member of the [Commission] on the date of enactment of this Act." PROTECT Act, Pub.L. No. 108–21, § 401(n)(2).

### DISCUSSION

Schnepper argues that the federal sentencing system created by the Reform Act and modified by Title IV contravenes the requirements of Article I and undermines the integrity of the Judicial Branch.[18] Before reaching the substance of his challenge, two discrete but related issues must be answered. The first is whether the Ex Post Facto Clause prevents the application of Title IV, in whole or in part, to Schnepper's sentencing. The second is whether Schnepper has standing to challenge the constitutional impact of Title IV.

### I. *The Ex Post Facto Clause*

■ The Constitution prohibits Congress and the states from passing any "ex post facto Law." *Miller v. Florida,* 482 U.S. 423, 429, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987) (quoting U.S. Const. art. I, § 9, and U.S. Const. art. I, § 10); *accord*

*Stogner v. California,* 539 U.S. 607, 123 S.Ct. 2446, 2449, 156 L.Ed.2d 544 (2003). This protection does not bar all retrospective legislation; it is aimed only at "laws that retroactively alter the definition of crimes or increase the punishment for criminal acts." *Souch v. Schaivo,* 289 F.3d 616, 620 (9th Cir.2002) (quoting *California Dep't of Corr. v. Morales,* 514 U.S. 499, 504, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995)).

■ When applicable, the ex post facto prohibition reaches "laws" in " 'every form in which the legislative power ... is exerted,' including 'a regulation or order.' " *Himes v. Thompson,* 336 F.3d 848, 854 (9th Cir.2003) (quoting *Ross v. Oregon,* 227 U.S. 150, 162–63, 33 S.Ct. 220, 57 L.Ed. 458 (1913)). Legislative acts, *Stogner,* 539 U.S. at ——, 123 S.Ct. at 2461, and regulatory or administrative changes, *Himes,* 336 F.3d at 863–64, are thus subject to the same constitutional scrutiny.

■ The standard for determining whether a law violates the Ex Post Facto Clause has two parts: first, the law must be "applied retroactively to the defendant"; and, second, the law must "have created a 'sufficient risk' of increasing the punishment attached to the defendant's crimes." *Himes,* 336 F.3d at 854 (quoting *Morales,* 514 U.S. at 509, 115 S.Ct. 1597); *accord United States v. Gonzalez,* 281 F.3d 38, 45 (2d Cir.2002). Even where a law operates to the defendant's detriment, however, no ex post facto violation occurs "if the change does not alter substantial personal rights, but merely [modifies] modes of procedure which do not affect matters of substance."[19] *Saucedo,* 950

18. Schnepper has not raised any other challenge to Title IV or to the application of the Guidelines Manual in his sentencing.

19. In the sentencing context, it is frequently observed that courts are "required to apply the guidelines, including 'any pertinent policy statements issued by the Commission,' that are in effect on the date the defendant is sentenced." *United States v. Saucedo,* 950

F.2d 1508, 1513 (10th Cir.1991) (quoting 18 U.S.C. § 3553(a)(4)-(5)). The exception to the rule is just as common: if a guideline change "disadvantages the defendant," the earlier version must be applied unless the amendment "merely clarif[ied] pre-existing guidelines," *id.* at 1513–14.

This presents essentially the same standard as recounted above, with the relevant consti-

F.2d at 1515 (quoting *Miller,* 482 U.S. at 429, 107 S.Ct. 2446).

## A. Retroactive Application

■ Schnepper committed most of the acts for which he was convicted in December 2001, with one act continuing until February 2002. Title IV was signed into law as part of the PROTECT Act on April 30, 2003, and the amendments to the Guidelines Manual were promulgated on and after that date.[20] Accordingly, Schnepper's criminal conduct clearly preceded the enactment of the relevant law.

■ In determining retroactivity, the mere fact that the crime antedates the law is not dispositive, however. The "critical question is whether the law changes the legal consequences of acts completed before its effective date." *Weaver,* 450 U.S. at 31, 101 S.Ct. 960; *accord Miller,* 482 U.S. at 430, 107 S.Ct. 2446. In other words, any law "which punishes as a crime an act previously committed, which was innocent when done, which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with a crime of any defense available according to the law at the time when the act was committed, is prohibited as ex post facto." *Johns,* 5 F.3d at 1270–71.

The Ex Post Facto Clause allows those provisions of Title IV and the Guidelines Manual that are not used against Schnepper in a constitutional sense to operate in Schnepper's sentencing. *Cf. United States v. VanLeer,* 270 F.Supp.2d 1318, 1320–21 (D.Utah 2003) ("Because the Feeney Amendment does not operate to retroactively disadvantage VanLeer, there is no ex post facto problem here."). This includes, for instance, PROTECT Act, Pub.L. No. 108–21, § 401(c), which directs the sentencing judge to specify his reasons for granting a downward departure in the written order of judgment and commitment. New reporting requirements do not, of course, change the legal consequences of Schnepper's past acts.

■ As to those provisions that "affect the measure of punishment attached to the original crime," *Himes,* 336 F.3d at 854, however, retroactivity is found where the new law merely narrows the availability of downward departures. This is because the legal consequences of Schnepper's criminal acts are different, at least potentially, than when he committed the underlying crimes.

Two obvious examples of this type of retroactivity are PROTECT Act Pub.L. No. 108–21, § 401(a), which limits the availability of downward departures, and the amendment to § 5K2.20 of the Guidelines Manual, which eliminates downward departures for aberrant behavior.[21] Both

tutional underpinning being, in either expression, the Ex Post Facto Clause. *Compare Gonzalez,* 281 F.3d at 45 (applying the ex post facto test to a guidelines amendment); *United States v. Johns,* 5 F.3d 1267, 1272 (9th Cir. 1993) (same); *United States v. Warren,* 980 F.2d 1300, 1304 (9th Cir.1992) (same); *and Himes,* 336 F.3d at 854–55 (applying an ex post facto analysis to amendments to parole regulations). When an amendment to the Guidelines Manual is at issue, retroactivity and disadvantage to the defendant are simply easier to see and to enunciate than in cases involving statutory changes. This enables courts to use the shorthand rule that "an amendment to a guideline that occurs after the commission of an offense is a violation of

the Ex Post Facto Clause if it works to the detriment of the defendant." *Gonzalez,* 281 F.3d at 46. The core analysis remains the same, however.

20. This Part does not address every section of Title IV or each amendment to the Guidelines Manual promulgated after Schnepper committed the offenses in question. Offered here is a general discussion of the Ex Post Facto Clause and an application of that constitutional provision to §§ 401(a) and 401(c) of the PROTECT Act, Pub.L. No. 108–21, and § 5K2.20 of the Guidelines Manual.

21. Congress directed the Commission to eliminate aberrant behavior as a basis for down-

changes apply to cases involving certain child crimes and sexual offenses, and both changes occurred after the criminal conduct in question but would control if the Court sentenced Schnepper pursuant to the current law. That being so, § 401(a) and the amendment to § 5K2.20 operate retroactively.

### B. Substantial Disadvantage

█ The Ex Post Facto Clause "is violated if a change in the law creates 'a sufficient risk of increasing the measure of punishment attached to the covered crime.' " *Himes,* 336 F.3d at 855 (quoting *Morales,* 514 U.S. at 510, 115 S.Ct. 1597). Such a risk is apparent "if, after comparing the two ... schemes as a whole," the new law is "detrimental" to the defendant. *Id.* The defendant is not required to show with certainty that he would have received a lesser sentence, only that he may have received a lesser sentence. *See Miller,* 482 U.S. at 432–33, 107 S.Ct. 2446; *Himes,* 336 F.3d at 855; *Johns,* 5 F.3d at 1272.

█ Taking § 401(a) first, the pre-Title IV version of 18 U.S.C. § 3553(b) provided:

The Court shall impose a sentence of the kind, and within the range, referred to in [the Guidelines Manual] unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the [Commission] in formulating the guidelines that should result in a sentence different from that described.

18 U.S.C. § 3553(b). Section 401(a) amended this provision to read:

In sentencing a defendant convicted of [a child crime or sexual offense, the Court shall impose] sentence of the kind,

ward departure for certain child crime and sexual offenses cases. PROTECT Act Pub.L.

and within the range, referred to in [the Guidelines Manual] unless—

(i) the court finds that there exists an aggravating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence greater than that described;

(ii) the court finds that there exists a mitigating circumstance of a kind or to a degree, that—

(I) has been affirmatively and specifically identified as a permissible ground of downward departure in the sentencing guidelines or policy statements issued under section 994(a) of title 28, taking account of any amendments to such sentencing guidelines or policy statements by Congress;

(II) has not been taken into consideration by the Sentencing Commission in formulating the guidelines; and

(III) should result in a sentence different from that described; or

(iii) the court finds, on motion of the Government, that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense and that this assistance established a mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence lower than that described.

PROTECT Act, Pub.L. No. 108–21, § 401(a).

It is apparent from even a causal comparison of the two versions of § 3553(b) that the availability of downward departures in cases involving certain · child

No. 108–21, § 401(b).

crimes and sexual offenses has been re-duced. Under the pre-Title IV law, the sentencing court was empowered to depart upward or downward based on the same rather amorphous standard. Following Title IV, the standard for granting an upward departure remains unchanged, but the standard for granting a downward departure is far more delimited. This change operates to Schnepper's disadvantage because the possibility that he will receive a downward departure is substantially reduced. *See Himes*, 336 F.3d at 855; *Johns*, 5 F.3d at 1272.

 It is of no moment that a downward departure was, in any circumstance, only a possibility. "[C]hanges in sentencing rules can violate the Ex Post Facto Clause when the rules sufficiently circumscribe official discretion, even if the change does not automatically lead to a more onerous result than would have occurred under the prior law." *Himes*, 336 F.3d at 856; *accord Johns*, 5 F.3d at 1272. The significant development for ex post facto purposes is that Schnepper is substantially less likely to receive a downward departure under the new version of § 3553(b). *See Miller*, 482 U.S. at 432–33, 107 S.Ct. 2446; *Himes*, 336 F.3d at 855–56; *Johns*, 5 F.3d at 1272.

 Turning to the Guidelines Manual, the version of § 5K2.20 in effect at the time of the underlying crime provided in relevant part that "[a] sentence below the applicable guideline range may be warranted in an extraordinary case if the defendant's criminal conduct constituted aberrant behavior." *Guidelines Manual* § 5K2.20 (Nov. 9, 2001). The operative language of § 5K2.20 now states that "[e]xcept where a defendant is convicted of a [child crime or sexual offense], a sen-

tence below the applicable guideline range may be warranted in an extraordinary case if the defendant's criminal conduct constituted aberrant behavior." *Guidelines Manual* § 5K2.20 (Oct. 30, 2002 & Supp. April 30, 2003).

Retroactively removing a basis for downward departure, as the amendment to § 5K2.20 has done, exhibits every element of an ex post facto violation. *See Johns*, 5 F.3d at 1271. Schnepper is obviously disadvantaged by the elimination of a previously valid ground for departure. *See Miller*, 482 U.S. at 433, 107 S.Ct. 2446; *Johns*, 5 F.3d at 1272. Again, Schnepper is not required to show that he would have received a departure for the now unavailable reason. *See Miller*, 482 U.S. at 432–33, 107 S.Ct. 2446; *Himes*, 336 F.3d at 855; *Johns*, 5 F.3d at 1272. It is enough that he might have warranted such a departure. *Johns*, 5 F.3d at 1272–73; *see also Miller*, 482 U.S. at 432–33, 107 S.Ct. 2446; *Himes*, 336 F.3d at 855–56.

### C. Application

 Because PROTECT Act, Pub.L. No. 108–21, § 401(a) and the amendment to § 5K2.20 of the Guidelines Manual retroactively operate to substantially disadvantage Schnepper, he cannot be denied a downward departure solely because the asserted ground is no longer available for the crimes for which he was convicted. Schnepper must, at the time of sentencing, be given the benefit of the versions of 18 U.S.C. § 3553(b) and § 5K2.20 of the Guidelines Manual in effect when he committed the crimes at issue.[22] *See Miller*, 482 U.S. at 432–33, 107 S.Ct. 2446; *Himes*, 336 F.3d at 855; *Johns*, 5 F.3d at 1272. This analysis will apply to any provision of Title IV and to any amendments to the

---

**22.** Counsel for the Government essentially conceded this point at the December 18, 2003 hearing.

Guidelines Manual that unfavorably alter the legal consequences of Schnepper's past criminal acts.[23]

Conversely, new statutory provisions and amendments to the Guidelines Manual that, like § 401(c), do not "create a sufficient risk of increasing the measure of punishment attached to the covered crimes," *Morales*, 514 U.S. at 510, 115 S.Ct. 1597, may be applied in Schnepper's sentencing without constitutional concern.[24]

## II. *Standing*

▮▮▮▮ The Constitution "confines the federal courts to adjudicating actual 'cases and controversies.'" *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). The standing doctrine, which asks whether a plaintiff is entitled to bring the dispute presently before the court, *Hawaii County Green Party v. Clinton*, 124 F.Supp.2d 1173, 1200 (D.Haw.2000), is one aspect of this fundamental limitation, *Allen*, 468 U.S. at 751, 104 S.Ct. 3315.

▮▮▮▮ The core component of the standing doctrine requires (1) that the complaining party has suffered an "injury in fact," that is, "an actual, concrete invasion of a legally protected interest"; (2) "a causal connection between the injury and the conduct complained of"; and (3) that it is likely a favorable decision will redress the injury.[25] *Lujan v. Defenders of Wild-*

*life*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

▮▮▮ Schnepper has standing to challenge the Guidelines Manual. First, Schnepper has suffered, or will eminently suffer, an injury in fact. Specifically, Schnepper is scheduled to be sentenced pursuant to the ranges and procedures established by the Commission and promulgated in its Guidelines Manual. Schnepper maintains that following Title IV, the Guidelines Manual, as a method determining sentences, is unconstitutional. An unconstitutional law is, of course, not a law at all. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176–78, 2 L.Ed. 60 (1803). Being sentenced pursuant to an invalid system thus presents an "actual, concrete invasion of a legally protected interest," *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130, in every meaningful sense of the phrase.

To be sure, not every section of Title IV or the amended Guidelines Manual is directly adverse to Schnepper. For instance, the Ex Post Facto Clause prohibits the application of certain provisions, *see supra*, while others do not apply because they govern distinct factual or procedural situations, *see, e.g.*, PROTECT Act, Pub.L. No. 108–21, § 401(e) (addressing sentencing upon remand). The large part of Title IV will effect Schnepper's sentencing in some way, however. *See, e.g.*, PROTECT

---

**23.** Other courts have noted ex post facto problems in retroactively applying certain provisions of Title IV and the subsequent amendments to the Guidelines Manual but have so far found it unnecessary to resolve the constitutional question. *See United States v. Sowemimo*, 335 F.3d 567, 573 (7th Cir.2003); *VanLeer*, 270 F.Supp.2d at 1320–21.

**24.** As noted *supra*, the foregoing discussion is by way of example only. This Order does not exhaust the potential applications of the Ex Post Facto Clause to Schnepper's sentencing in general or to his Motion for Downward Departure in particular. Each ground for

departure raised in Schnepper's Motion will be addressed by separate Order.

**25.** Standing also has a prudential component that consists of

judicial self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.

*Allen*, 468 U.S. at 751, 104 S.Ct. 3315.

Act, Pub.L. No. 108–21, §§ 401(c) (directing the sentencing court to specify its reasons for granting a downward departure in the written order of judgment and commitment), 401(d) (changing appellate review to a de novo standard),[26] 401(h) (enhancing the data collection methods), and 401(*l*) (directing the attorney general to report to Congress). And, more importantly, the sentencing system challenged here (binding guidelines promulgated by the Commission), unless invalidated, will determine Schnepper's punishment.

It was equally true in *Mistretta* that not every section of the Reform Act or the subsequently promulgated Guidelines Manual applied to or narrowed the permissible range of sentences for distribution of cocaine—the offense at issue in the primary challenge. So, too, that certain provisions of the Reform Act would not, in any conceivable circumstance, have directly invaded the defendant's legally protected rights. *See* 28 U.S.C. § 991(a) (requiring that at least three federal judges serve on the Commission). Nevertheless, the Court, without hesitation, allowed the challenge to proceed.[27]

The reason is because the challenge was to the legislation and its effect as a whole. So it is here. As in *Mistretta*, Schnepper does not assert, for example, that PROTECT Act, Pub.L. No. 108–21, § 401(a) is unconstitutional because of what it does to him—say, abridge due process requirements. Rather, Schnepper argues that the legislation as a whole, § 401(a) included, causes or exacerbates a violation of the principle of separation of powers. If

Schnepper is correct, no defendant, irrespective of the nature or date of the underlying offense, may be sentenced pursuant to the Guidelines Manual. This real and imminent harm presents a cognizable injury in fact.

The second element of standing, "a causal connection between the injury and the conduct complained of," *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130, is satisfied because the Guidelines Manual is the source of the injury to Schnepper. Without the Guidelines Manual, the harm complained of disappears.

The final element of standing, redressability, is met because a decision in Schnepper's favor will invalidate the Guidelines Manual, thereby providing precisely the relief he seeks.

In summary, Schnepper will suffer an injury in fact if he is sentenced pursuant to an unconstitutional sentencing scheme. His injury is both fairly traceable to the challenged law and likely to be redressed by a decision in his favor. Accordingly, Schnepper has standing to challenge Title IV as creating or contributing to a sentencing system that violates the Constitution.

### III. *Article I*

▉ Article I, § 1, of the Constitution vests the legislative power "in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const. art. I, § 1. The legislative power is the power to pass bills, *Mistretta*, 488 U.S. at 419–20, 109 S.Ct. 647 (Scalia,

---

**26.** Courts to confront the new standard of review have applied PROTECT Act, Pub.L. No. 108–21, § 401(d) to cases pending on appeal when Title IV became law. *See United States v. Gonzales–Ortega*, 346 F.3d 800, 802 (8th Cir.2003); *United States v. Mallon*, 345 F.3d 943, 946–47 (7th Cir.2003); *United States v. Thurston*, 2004 WL 203162, at *17–18, 358 F.3d 51, 70–72 (1st Cir.2003).

**27.** This contrasts with *Federal Defenders of San Diego, Inc. v. United States Sentencing Commission*, 680 F.Supp. 26 (D.D.C.1988), where the district court rightly denied a group of public defenders standing to challenge the Reform Act as unconstitutional.

J., dissenting), and, as every schoolchild knows, bills must navigate Congress and be presented to the President for approval or objection before becoming law, U.S. Const. art. I, § 7.

 Congress is powerless to deviate from these "finely wrought and exhaustively considered[ ] procedures." *INS v. Chadha,* 462 U.S. 919, 951, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). Every law thus becomes law only in accord with Article I. *Bowsher v. Synar,* 478 U.S. 714, 757–59, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986) (Stevens, J., concurring). Congressional efforts to legislate without Bicameralism and Presentment or to "delegate the power to legislate to [Congress'] own agents or to its own Members" are invalid. *Metropolitan Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.,* 501 U.S. 252, 275, 111 S.Ct. 2298, 115 L.Ed.2d 236 (1991).

Schnepper, in a rather convoluted way, asserts that Title IV contravenes these bedrock principles. Specifically, Schnepper argues that the Commission is no longer an agency within the Judicial Branch. Rather, Schnepper continues, the "proper characterization of the [Commission] is now that of a legislative agency—what Justice Scalia characterized as 'a sort of junior-varsity Congress.' " Defendant's Memorandum in Support of Motion for Relief ("Memo in Supp."), at 21 (quoting *Mistretta,* 488 U.S. at 427, 109 S.Ct. 647 (Scalia, J., dissenting)). As such, Schnepper concludes, actions by the Commission amount to legislating without following the procedures set forth in Article I.

The Reform Act described the Commission as an independent agency within the Judicial Branch of the United States. 28 U.S.C. § 991(a). *Mistretta* agreed, 488 U.S. at 398, 109 S.Ct. 647, and Title IV left that designation undisturbed, PROTECT Act, Pub.L. No. 108–21, § 401, et seq. Nevertheless, Schnepper maintains that the following provisions of Title IV fundamentally alter the appropriate placement of the Commission:

1. Requiring that "not more than three," rather than "at least three," of the members of the Commission be federal judges, PROTECT Act, Pub.L. No. 108–21, § 401(n)(1);

2. Limiting the permissible grounds for departure in certain child crimes and sexual offenses cases, PROTECT Act, Pub.L. No. 108–21, §§ 401(a)-(b);

3. Directing the Commission to amend the Guidelines Manual and not to promulgate new grounds for departure for at least two years PROTECT Act, Pub.L. No. 108–21, § 401(j), to reduce the incidents of downward departures, § 401(m)(2)(A), and to otherwise conform to Title IV, § 401(m)(2)(C);

4. Amending the reporting procedures to require a written statement of the reasons for departure, PROTECT Act, Pub.L. No. 108–21, § 401(c), to make more information available to Congress, § 401(h)(1)-(3), and to enlist the assistance of the Chief Judge of each district in reporting to the Commission, § 401(h)(1); and

5. Converting appellate review to a de novo standard, PROTECT Act, Pub.L. No. 108–21, § 401(d).

Defendant's Memo in Supp., at 18–19.

Schnepper's argument regarding § 401(n) reveals a misunderstanding of *Mistretta. Mistretta* did not hold the Commission to be in the Judicial Branch because at least three of its members were required to be federal judges. Rather, *Mistretta* accepted Congress' placement of the Commission in the Judiciary because the job of the Commission—determining sentences by promulgating guidelines—involved "substantive judgment in the field of sentencing" and rulemaking, two subjects that have "been and remain[ ] appro-

priate to the Judicial Branch." *Mistretta,* 488 U.S. at 397, 109 S.Ct. 647. Because the function performed by the Commission was appropriate to the Judiciary, "locating the Commission within the Judicial Branch pose[d] no threat of undermining the integrity of the Judicial Branch or of expanding the powers of the Judiciary beyond constitutional bounds ...." *Id.* at 393, 109 S.Ct. 647.

Changing the composition of the Commission from "at least three federal judges" to "not more than three federal judges" does not alter the substantive work of the Commission.[28] The Commission "is not a court, does not exercise judicial power, and is not controlled by or accountable to members of the Judicial Branch. The Commission, on which members of the Judiciary may be a minority, is an independent agency in every relevant sense." [29] *Mistretta,* 488 U.S. at 393–94, 109 S.Ct. 647; *see also United States v. Griffith,* 85 F.3d 284, 290 (7th Cir.1996).

In fact, the Court was somewhat troubled by "Congress' requirement of judicial service" on the Commission.[30] *Mistretta,* 488 U.S. at 397, 109 S.Ct. 647. This feature of the Reform Act was upheld, of course, but not without "difficulty." *Id.* at 407, 109 S.Ct. 647. From the tenor of the opinion, it appears that the Court would have been more comfortable had the Commission been comprised entirely of members not presently serving as Article III judges.[31] *See id.* at 397–407, 109 S.Ct. 647; *cf. Lo Duca v. United States,* 93 F.3d 1100, 1109 (2d Cir.1996) (discerning no separation of powers issue when magistrate judges act in extrajudicial capacities; "[s]ince federal magistrate judges are not Article III judges, the Constitution does not accord them the same protections against Congressional expansion of their duties.").

A serious constitutional problem would arise if members of the Commission were concurrently members of Congress, *see Citizens for Abatement of Aircraft Noise v. Metropolitan Wash. Airports Auth.,* 917 F.2d 48, 56–57 (D.C.Cir.1990), *aff'd* 501 U.S. 252, 111 S.Ct. 2298, 115 L.Ed.2d 236 (1991), or if Congress had the power to remove Commissioners, *cf. Bowsher,* 478 U.S. at 726, 106 S.Ct. 3181 ("Congress cannot reserve for itself the power of removal of an officer charged with the execution of the laws except by impeachment."). Such is not the case, however. There is no provision for congressmen to serve on the Commission. So, too, Congress has only a limited role in appointing Commissioners

---

**28.** The inquiry into whether an agency is exercising powers more appropriately assigned to another Branch is not an invitation to engage in a policy analysis regarding the best placement of that agency. The Court is to determine whether Congress made a constitutionally acceptable choice. If Congress did, the matter is closed.

**29.** Federal judges in fact formed a minority of the Commission when *Mistretta* was decided. *See* Former Commissioners of the United States Sentencing Commission, available at http://www.ussc.gov/general/Oldcomms.htm (last visited on December 5, 2003).

**30.** Prior to *Mistretta,* a number of lower courts had invalidated the Reform Act because of the service of Article III judges. *See* Black, *supra,* at 775. Although a federal judicial presence did not ultimately sink the Commission, it was clearly not a constitutional prerequisite. Arguments in favor of placing Article III judges on the Commission rest upon practical grounds, such as judicial experience, *see Mistretta,* 488 U.S. at 408, 412, 109 S.Ct. 647; Black, *supra,* at 78—nothing so weighty as the Constitution.

**31.** The Court's favorable discussion of other agencies within the Judicial Branch—"some of which are comprised of judges, others of judges and nonjudges, still others of nonjudges only," *Mistretta,* 488 U.S. at 389, 109 S.Ct. 647—though not binding, further supports this observation.

and, importantly, no power to remove Commissioners from office.[32] *Cf. United States v. Hilario,* 218 F.3d 19, 28 (1st Cir.2000) (deeming "it especially important" the challenged statute neither grants one Branch the power to supervise or to remove a member of another Branch "whom they have appointed").

■ In any event, a Commission without federal judges is merely a possibility, not an eventuality, under Title IV. Section 401(n)(1) does not apply to "any person who is serving, or who has been nominated to serve, as a member of the [Commission] on the date of enactment of this Act." PROTECT Act, Pub.L. No. 108–21, § 401(*l*)(2). At least three federal judges presently serve on the Commission and there is no indication that fewer judges will volunteer for or be appointed to the Commission in the near future. Schnepper cannot rely on speculation to show a harm that will not, in any conceivable circumstance, materialize before he is sentenced, if ever.[33] *See Thomas v. Union Carbide Ag. Prods. Co.,* 473 U.S. 568, 580–81, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985); *United States v. Linares,* 921 F.2d 841, 843 (9th Cir.1990) (holding that harms that might never occur are not ripe for adjudication).

■ Sections 401(a) and 401(b) likewise offer little support for Schnepper's position. Congress has the power to define with absolute precision the sentence for every crime in the federal Code. *Chapman v. United States,* 500 U.S. 453, 467, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991)

("Congress has the power to define criminal punishments without giving the courts any sentencing discretion."); *Mistretta,* 488 U.S. at 364, 109 S.Ct. 647 ("Congress, of course, has the power to fix the sentence for a federal crime, and the scope of judicial discretion with respect to a sentence is subject to congressional control.") (citations omitted). That being so, Congress' decision to narrow, by statute, the permissible grounds for departure in cases involving certain child crimes and sexual offenses is entirely consistent with Article I. *Cf. Chapman,* 500 U.S. at 467, 111 S.Ct. 1919 ("A sentencing scheme providing for 'individualized sentences' rests not on constitutional commands . . . .").

With respect to §§ 401(j) and 401(m), the significant development for constitutional purposes was the creation of an agency tasked with establishing sentencing guidelines. This was accomplished in the Reform Act and upheld in *Mistretta. See* 488 U.S. at 374–79, 109 S.Ct. 647. Having crossed that line, further mandates regarding permissible grounds for departure are of little consequence. *Cf. Koon* 518 U.S. at 94–96, 116 S.Ct. 2035 (discussing the limited discretion left to sentencing judges under the Reform Act and the power of the Commission to eliminate permissible grounds for departure).

The same is true of §§ 401(c) and 401(h). The salient point is that sentencing courts must state their reasons for departure and report every sentence entered to the Commission (and the Commis-

---

**32.** A congressional removal power is worrisome because an official's "presumed desire to avoid removal by pleasing Congress ... creates ... subservience" to that Branch. *Bowsher,* 478 U.S. at 728 n. 5, 106 S.Ct. 3181 (quoting *Synar v. United States,* 626 F.Supp. 1374, 1392 (D.D.C.1986)). The Reform Act and Title IV avoid this problem.

**33.** The premature nature of any complaint regarding the potential composition of some future Commission is not to be confused with Schnepper's standing to challenge Title IV and the provisions thereof as creating an unconstitutional sentencing system. It simply happens that the effect of § 401(n) on the Commission, the Guidelines Manual and the sentencing scheme in general remains entirely speculative.

sion to Congress). Like the delegation of the power to establish sentencing guidelines, the reporting provisions were established in the Reform Act and upheld in *Mistretta.*

■ Title IV does not grant Congress the power to overrule a sentencing decision with which they disagree. *Cf. Clinton v. Jones*, 520 U.S. 681, 699, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997) ("Congress may not exercise the judicial power to revise final judgments . . . ."). Nor does it allow Congress to amend the Guidelines Manual except by validly enacted legislation.[34] *Cf. Bowsher*, 478 U.S. at 733–34, 106 S.Ct. 3181 ("Congress can . . . control the execution of its enactment[s] only indirectly—by passing new legislation."). Title IV merely adds specificity and timeliness to the sentencing court's reporting duties and makes a greater variety of information available to Congress. These changes hardly convert the Commission from an independent agency of the Judicial Branch into a legislative tool of Congress.

The final section challenged here, § 401(d), is sustained by observation that Congress has the power to establish and define the jurisdiction of lower federal courts. U.S. Const. art. III, § 1; *Keene Corp. v. United States*, 508 U.S. 200, 207, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993) ("Congress has the constitutional authority to define the jurisdiction of the lower federal courts . . . ."). Prior to the Reform Act, "a federal criminal sentence within the statutory limits was, for all practical purposes, not reviewable on appeal." *Koon*, 518 U.S. at 96, 116 S.Ct. 2035; Wilkins, et al., *supra*, at 372–73. The Reform Act dramatically expanded the right to appeal for both defendant and the government, *Koon*, 518 U.S. at 96, 116 S.Ct. 2035, and *Mistretta* rightly offered no resistance. Further modifying appeals by establishing de novo review as the relevant standard does not wrest the Commission from its home in the Judiciary.[35]

Considering the foregoing sections individually or as a collective, there is no basis to view the Commission as anything other than that described by statute and sanctioned in *Mistretta:* an independent agency within the Judicial Branch.[36] *Cf. Griffith*, 85 F.3d at 290–91. As an independent agency within the Judicial Branch performing the same functions that it did under the Reform Act, the Court is bound

**34.** Section 994(p) provides that the Commission may

> promulgate and submit to Congress amendments to the guidelines and modifications to previously submitted amendments that have not taken effect . . . . Such an amendment or modification . . . shall take effect on a date specified by the Commission, which shall be no earlier than 180 days after being so submitted and no later than the first day of November of the calendar year in which the amendment or modification is submitted, except to the extent that the effective date is revised or the amendment is otherwise modified or disapproved by Act of Congress.

28 U.S.C. § 994(p). Section 994(p), original to the Reform Act, is not an unconstitutional "legislative veto." Rather, § 994(p) is a valid " 'report and wait provision' which allows

Congress an opportunity to review the guidelines or amendments before they become effective and to pass legislation barring their effectiveness if Congress finds the guidelines or amendments objectionable." *United States v. Litteral*, 910 F.2d 547, 552 (9th Cir.1990). Title IV does not alter § 994(p).

**35.** Courts have thus far discerned no constitutional problem in Congress' modification of the standard of review. *See Gonzales–Ortega*, 346 F.3d at 802; *Mallon*, 345 F.3d at 946–47 (7th Cir.2003); *Thurston*, 2004 WL 203162 at *17–18, 358 F.3d at 70–72.

**36.** Because the Court finds that the Commission remains an independent agency of the Judicial Branch, the Court does not address Schnepper's alternative argument that the Commission would be unconstitutional if regarded as an Executive agency.

by *Mistretta*'s conclusion that the Commission is not legislating in violation of Article I, but is acting pursuant to a valid congressional delegation.[37]

According to *Mistretta*, "[d]eveloping proportionate penalties for hundreds of different crimes is precisely the sort of intricate, labor intensive task for which delegation to an expert body is especially appropriate." *Mistretta*, 488 U.S. at 379, 109 S.Ct. 647. And "[s]o long as Congress 'shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power.'" *Id.* at 372, 109 S.Ct. 647 (quoting *JW Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 406, 48 S.Ct. 348, 72 L.Ed. 624 (1928)).

The principles to which the Commission is required to conform have not become less intelligible under Title IV. Quite the opposite: Title IV even more clearly expresses Congress' goals in sentencing and the factors that are to guide the Commission in developing the Guidelines Manual. The Court has "no doubt that in the hands of the Commission 'the criteria which Congress has supplied are wholly adequate for carrying out the general policy and purpose,'" *Mistretta*, 488 U.S. at 379, 109

---

**37.** Schnepper relies heavily on Justice Scalia's dissent in *Mistretta*. His reliance is misplaced. Justice Scalia views separation of powers in a fundamentally different way than the *Mistretta* majority. *Mistretta* looked at separation of powers from a functional prospective, that is, the Branches may exercise unassigned powers so long as "encroachment or aggrandizement" does not result. *See* 488 U.S. at 381–82, 109 S.Ct. 647. So, too, Congress may delegate rulemaking authority to another Branch (or an to agency within that Branch) provided that Congress sets forth an "intelligible" guiding directive. *See id.* at 373, 109 S.Ct. 647. Following these principles, the Court held that the Reform Act was not an unconstitutional delegation of legislative power, and that the Commission, placed in the Judiciary, did not violate the separation of powers. *See supra* Background II. B.

In contrast, Justice Scalia takes a structured approach to the separation of powers. He regards the purposeful division of powers as "more than a generalized prescription that the functions of the Branches should not be commingled too much ...." *Mistretta*, 488 U.S. at 426, 109 S.Ct. 647 (Scalia, J., dissenting). Rather, the Constitution "is the prescribed structure, a framework, for the conduct of government." *Id.* Inter–Branch power-sharing is, therefore, permissible only to the extent specifically provided for in the Constitution. *See id.*

Under Justice Scalia's analysis, the Reform Act fails not because it lacks an "intelligible principle," but because "there is no acceptable delegation of legislative power." *Mis-*

*tretta*, 488 U.S. at 419, 109 S.Ct. 647 (Scalia, J., dissenting). The Executive and Judicial Branches have rulemaking authority because, in certain circumstances, rulemaking is attendant to the function of those Branches. *Id.* at 418–19, 109 S.Ct. 647. But unlike rulemaking by an Executive agency or by the Supreme Court in matters ancillary to the proper exercise of their respective powers (e.g., adopting rules of procedure), the Commission's duty to promulgate sentencing guidelines is not predicated upon another, legitimate function. It is instead "completely divorced from any responsibility for execution of the law or adjudication of private rights under the law." *Id.* at 420, 109 S.Ct. 647. In short, the Reform Act is unconstitutional because the "only governmental power the Commission possesses is the power to make law; and it is not Congress." *Id.* at 422, 109 S.Ct. 647. For Justice Scalia, the placement of the Commission in the Judicial Branch, when the Commission "is not a court, does not exercise judicial power, and is not controlled by or accountable to members of the Judicial Branch," *id.* at 393, 109 S.Ct. 647, serves only to illustrate the logical failings of the majority opinion, *see id.* at 422–25, 109 S.Ct. 647 (Scalia, J., dissenting).

The positions taken by the *Mistretta* majority and dissent are, in a word, irreconcilable. One cannot be conflated with the other as if a change in the number of judges on the Commission or to the reporting requirements would have swung the majority to the dissent's side. It would not have.

S.Ct. 647 (quoting *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 398, 60 S.Ct. 907, 84 L.Ed. 1263 (1940)), of the Reform Act and Title IV.

## IV. *Interference with the Judicial Branch*

The Constitution places the Legislative, Executive and Judicial powers in distinct spheres of government. *Bowsher*, 478 U.S. at 721, 106 S.Ct. 3181; *Chadha*, 462 U.S. at 951, 103 S.Ct. 2764. The "judicial Power of the United States"—the power to render dispositive judgments, *Miller v. French*, 530 U.S. 327, 344, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000)—is "vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish," U.S. Const. art. III, § 1. No other Branch or body possesses this " 'province and duty ... to say what the law is' in particular cases and controversies." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995) (quoting *Marbury*, 5 U.S. (1 Cranch) at 177); *see also Freytag v. Commissioner of Internal Revenue*, 501 U.S. 868, 908, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991) (Scalia, J., concurring).

As discussed *supra*, however, the intentional and structured division of powers is not as static as it might otherwise appear.

> While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy, but reciprocity.

*Mistretta*, 488 U.S. at 381, 109 S.Ct. 647 (quoting *Youngstown*, 343 U.S. at 635, 72 S.Ct. 863). Accordingly, practical concerns over the "encroachment or aggrandizement" of the Branches animate separation of powers jurisprudence. *See id.* at 382, 109 S.Ct. 647; *see also Chadha*, 462 U.S. at 951, 103 S.Ct. 2764. In cases involving the Judicial Branch this analysis focuses on two specific dangers:

> first, that the Judicial Branch neither be assigned nor allowed "tasks that are more properly accomplished by [other] Branches," and, second, that no provision of law "impermissibly threatens the institutional integrity of the Judicial Branch."

*Mistretta*, 488 U.S. at 383, 109 S.Ct. 647 (citations omitted) (alterations in original).

Schnepper argues that Title IV threatens the institutional integrity of the Judicial Branch because the purpose of Title IV is to discourage "particular types of sentences, namely, downward departures ...." Defendant's Memo in Supp., at 31. Schnepper is no doubt correct that Congress intended to limit certain sentencing practices. This was no less true and, indeed, more apparent in the Reform Act. The newcomer, Title IV, reinforces that Congress, as a matter of policy, believes sentencing courts should have less discretion regarding the punishment imposed. Such is Congress' right. *Chapman*, 500 U.S. at 467, 111 S.Ct. 1919. The only question is whether Congress has selected a constitutionally acceptable means to accomplish its perfectly constitutional goal.

In *Mistretta*, an overwhelming majority of the Court upheld the Reform Act as consistent with the separation of powers. It is difficult to see how Title IV threatens the institutional integrity of the Judiciary in a way not addressed in *Mistretta*. Undaunted, Schnepper argues that the enhanced reporting requirements of Title IV have an impermissibly intimidating effect on the sentencing court's decision to enter a downward departure. In particular, Schnepper points to the following provisions as indirectly coercive:

1. Requiring that sentencing judges state their reasons for departure in open

court and describe such reasons with specificity in the written order of judgment and commitment. PROTECT Act, Pub.L. No. 108–21, § 401(c);

2. Tasking the Chief Judge of each district court with the obligation to ensure that sentencing judges report to the Commission in a timely fashion. PROTECT Act, Pub.L. No. 108–21, § 401(h)(1);

3. Directing the Commission to make available to the House and Senate Committees on the Judiciary, upon request, the records received from district courts, PROTECT Act, Pub.L. No. 108–21, § 401(h)(2), and to submit an annual analysis of these reports to Congress, including "an accounting of those districts that ... have not submitted the appropriate information," § 401(h)(3);

4. Directing the Commission to "make available to the Attorney General, upon request, such data files as the Commission may assemble or maintain in electronic form that include any information submitted [by district courts]. Such data files shall be made available in electronic form and shall include all data fields requested, including the identity of the sentencing judge," PROTECT Act, Pub.L. No. 108–21, § 401(h)(4); and

5. Directing the Attorney General to submit, "[n]ot later than 15 days after a district court's grant of a downward departure ... a report to the Committees on the Judiciary" containing various information, including the case, the identity of the sentencing judge, and his reasons for the downward departure, PROTECT Act, Pub.L. No. 108–21, § 401(*l*)(2).

Defendant's Memo in Supp., at 28–29.

With respect to § 401(c), the Reform Act instructed the sentencing judge to state, in open court, his reason for granting a downward departure. 18 U.S.C. § 3553(c). *Mistretta* found nothing coercive about this requirement. *See* 488 U.S. at 406 n. 28, 109 S.Ct. 647. Further directing the sentencing judge to memorialize "in the written order of judgment and commitment" his reasons for departing, PROTECT Act, Pub.L. No. 108–21, § 401(c), is duplicative and relatively trivial by comparison.

With respect to § 401(h)(1), Schnepper asserts that this provision requires the Chief Judge of each district to "report the details of all sentences, including whether or not there was a departure," to the Commission. Defendant's Memo in Supp., at 29. Schnepper misreads the statute. Section 401(h)(1) directs the Chief Judge to "ensure that, within 30 days following entry of judgment in every criminal case, the sentencing court submits to the Commission a written report ...." PROTECT Act, Pub.L. No. 108–21, § 401(h)(1). Reporting the sentence imposed remains the duty of the sentencing judge.[38] *Compare* 28 U.S.C. § 994(w) *with* PROTECT Act, Pub.L. No. 108–21, § 401(h)(1).

As for §§ 401(h)(2) and (h)(3), neither the sentencing court reports nor the Commission's obligation to provide Congress with an annual analysis of the same are entirely new. *See United States v. Ray,*

---

38. As Schnepper concedes, Morris' Reply, at 6–8, the Commission obtained the assistance of the Chief Judge of each district in collecting the reporting data prior to Title IV, *Ray,* 273 F.Supp.2d at 1161; Ex. 1 to Government's Appdx. Schnepper complains, however, that the cooperation of the Chief Judge is compelled under Title IV rather than voluntarily given as before.

*Mistretta* found no coercion in directing judges to report themselves in each sentencing matter. *See* 488 U.S. at 406 n. 28, 109 S.Ct. 647. Next to that obligation, instructing the Chief Judge to ensure such reporting occurs in a timely manner is a burdensome but harmless task.

273 F.Supp.2d 1160, 1164 (D.Mont.2003) ("The new version of [the reporting requirement does] not materially change the documents the Court must submit to the [Commission]."). As discussed, the Reform Act instructed Sentencing courts to submit detailed reports to the Commission "in connection with each sentence imposed." 28 U.S.C. § 994(w). This enabled the Commission to compile data on sentencing practices and to submit an annual analysis to Congress, together with "any recommendations for legislation that the Commission concludes is warranted by that analysis." *Id.*

Whatever intimidating effect the reporting requirement and congressional review of sentencing practices may have, it was accomplished in the Reform Act and disregarded (for constitutional purposes) in *Mistretta. See* 488 U.S. at 406 n. 28, 109 S.Ct. 647. Granting Congress access to the reports themselves, PROTECT Act, Pub.L. No. 108–21, § 401(h)(2), providing for an accounting of the district courts that have not submitted the required information, § 401(h)(3), and allowing the Attorney General to view "such data files as the Commission may assemble or maintain in electronic form," § 401(h)(4), have no additional impact on the integrity of the Judicial Branch. *Cf. VanLeer,* 270 F.Supp.2d at 1324 ("[The court] is not concerned about close scrutiny of its downward (or upward) departure decisions by Congress, the public, or otherwise.").

Indeed, the information requested is already available to the public in every relevant part. *See VanLeer,* 270 F.Supp.2d at 1324. These reporting and data compilation provisions are, on their face, convenient information-gathering tools.[39] There is no "direct review of a judicial decision by officials of the Legislative or Executive Branches," *Miller,* 530 U.S. at 343, 120 S.Ct. 2246. Nor may Congress reverse or amend the Commission or its Guidelines Manual by any means except validly enacted legislation. *Cf. Bowsher,* 478 U.S. at 733–34, 106 S.Ct. 3181.

Finally, Schnepper's challenge to § 401(*l*)(2) is misplaced. Schnepper correctly points out that Title IV directs the Attorney General to submit to the House and Senate Judiciary Committees a comprehensive report within fifteen days after any sentencing court issues a downward departure.[40] PROTECT Act, Pub.L. No. 108–21, § 401(*l*)(2). Title IV contains an alternate provision, however, that allows the Attorney General to avoid § 401(*l*)(2) by submitting a report to Congress detailing "the policy and procedures that the Department of Justice has adopted subsequent to the enactment of this Act," § 401(*l*)(1), within 90 days of the PROTECT Act becoming law, § 401(*l*)(3).

The Attorney General submitted a report to the relevant committees on July 28, 2003. Ex. 4 to Government's Appdx. The report contained a memorandum from the

---

**39.** The "collection of information about sentencing practices employed by federal judges throughout the country ... is a legitimate sphere of congressional inquiry, in aid of its legislative authority." Remarks of the Chief Justice to the Federal Judges Association Directors Meeting, May 5, 2003, available at www.supremecourtus.gov (last visited on December 31, 2003).

**40.** With respect to PROTECT Act, Pub.L. No. 108–21, § 401(*l*)(2), Chief Justice Rehnquist commented:

[O]ne portion of the law provides for the collection of [information about sentencing practices employed by federal judges] on an individualized judge-by-judge basis. This, it seems to me, is ... troubling. For side-by-side with the broad authority of Congress to legislate and gather information in this area is the principle that federal judges may not be removed from office for their judicial acts.

Remarks of the Chief Justice, *supra* n. 39.

Attorney General addressed to all federal prosecutors and an amendment to § 9–2.170(B) of the United States Attorney's Manual ("Attorneys' Manual").[41] The accompanying cover letter (addressed to the Honorable F. James Sensenbrenner, Jr., Chairman of the House Committee on the Judiciary) stated that the report satisfied the requirements of §§ 401($l$)(1) and 401($l$)(3) and, therefore, the Attorney General is "notifying Department attorneys [§ 401($l$)(2) of Title IV] will not take effect."[42] *Id.*

There is no evidence that Congress viewed the report as insufficient or that the Attorney General has since implemented § 401($l$)(2). Schnepper cannot rely on speculative assertions of future coercion in his present challenge.[43] *See Thomas,* 473

**41.** Section 9–2.172(B) addresses the procedures for reporting and appeal of adverse decisions.

**42.** The reporting procedures ordered by PROTECT Act, Pub.L. No. 108–21, § 401($l$)(2) and the reporting procedures implemented by the Attorney General's memorandum and the amendment to § 9–2.170(B) of the Attorney's Manual are qualitatively different. Section 401($l$)(2) directs the attorney general to report to Congress following every downward departure. In contrast, the amendment to § 9–2.170(B) of the Attorney's Manual sets forth the circumstances in which the federal prosecutor is to report sentencing decisions to the Appellate Section of the Criminal Division of the Department of Justice.

One Branch reporting to another Branch every time an officer of the third Branch executes his duty in a particular way may raise separation of powers concerns. *See* Remarks of the Chief Justice, *supra* n. 39. The same cannot be said of intra-Branch reporting of a limited number of decisions so that an appeal may be taken to a body within the appropriate Branch.

**43.** Again, the premature nature of complaints surrounding § 401($l$)(2) are not to be confused with Schnepper's general standing to challenge Title IV as creating an unconstitutional sentencing system.

U.S. at 580–81, 105 S.Ct. 3325; *Linares,* 921 F.2d at 843.

■ Perhaps recognizing the fundamental problem with his argument, Schnepper also attacks the amendment to § 9–2.170(B). Schnepper asserts that "there are provisions which tend to chill the extent of departure by requiring reporting only if the departure exceeds a certain magnitude .... [In addition, one provision] smacks of 'keeping book' on 'bad judges' by requiring reporting of any 'improper[ ]' downward departure that 'has become prevalent in the district or with a particular judge.'"[44] Defendant's Memo in Supp., at 30 (quoting Attorneys' Manual § 9–2.170(B)(7) (July 28, 2003)).

The pre-amendment version of § 9–2.170(B) provided in part:

**44.** The provision that Schnepper references, subsection 7, is one of nine "categories of adverse decisions required to be reported" to the Appellate Section of the Criminal Division of the Department of Justice. Section 7 reads:

Recurring illegal departures: An adverse decision must be reported if the following two criteria are met:
(a) the court improperly departed downward in a manner that is not otherwise required to be reported; and
(b) the basis for departure has become prevalent in the district or with a particular judge.

Attorneys' Manual § 9–2.170 (July 28, 2003).

Two self-limiting characteristics make this section unobjectionable. First, from the context of § 9–2.170, it appears that subsection 7 applies only when there has been an illegal departure, that is, a downward departure that violates a statute or the Guidelines Manual. *See* Attorneys' Manual § 9–2.170(7); *compare id. with* § 9–2.170(5) *and* § 9–2.170(8). This standard demands something more than prosecutorial disagreement with the departure. Second, the report is made to a division within the Department of Justice for the purpose of determining whether an appeal will be taken. The final decision as to the appropriateness of the departure will be made by a higher Article III court, not the Executive.

United States Attorneys' Office (US-AOs) should report all adverse appealable district court decisions to the Appellate Section . . . . . USAOs need only report adverse district court Sentencing Guidelines decisions if they wish to obtain authorization to appeal that decision. Other adverse sentencing decisions should be reported.

Ex. 2 to Government's Appdx. This now-obsolete language reveals that reporting and appealing adverse sentencing decisions are not new developments.[45] The practice has simply become more structured under the new amendment.

Furthermore, it is unclear how federal prosecutors reporting to the Appellate Section will "tend to chill the extent of departure[s]," Defendant's Memo in Supp., at 30, as Schnepper asserts. The Attorneys' Manual is an internal directive binding only on certain members of the Executive Branch. *See, e.g., United States v. Male Juvenile,* 148 F.3d 468, 472 n. 6 (5th Cir.1998). The Appellate Section lies within the Department of Justice, which, of course, exercises no authority or control over the decisions (including sentencing decisions) of Article III judges. *Cf. Plaut,* 514 U.S. at 218, 115 S.Ct. 1447 ("Congress cannot vest review of decisions of Article III courts in officials of the Executive Branch.").

There is no constitutional problem in simple Executive Branch disagreement with Judicial decisions. The Executive has long made its opinions known to the Judicial Branch. This is true not only in cases to which the United States is a party—such as criminal prosecutions—but also where the United States acts as amicus curiae. As to the latter role, there has been a dramatic rise in briefs filed by the Solicitor General (a particularly powerful Executive Branch voice) in the last fifty years. *See The Solicitor General as Amicus, 1953–2000: How Influential?,* 87 Judicature 61, 63 (Sep.-Oct.2003). It is also common for the President and other Executive officers to criticize or applaud particular decisions in public statements. *See* BBC News: Legal Terror Blow for Bush Hailed, available at http://news.bbc.co.uk (last visited on December 23, 2003).

Congress and congressmen likewise express their views of the law, the merits of a particular case or the abilities of particular judges. These expressions are found in floor speeches, statements to the media and legal actions brought or joined by Congress, *see, e.g., Chadha,* 462 U.S. at 930 n. 5, 103 S.Ct. 2764, and individual members of Congress, *see, e.g., McConnell v. Federal Election Comm'n,* —— U.S. ——, 124 S.Ct. 619, 157 L.Ed.2d 491 (Dec. 10, 2003).

None of these practices are thought to undermine the integrity of the Judicial Branch. Fortunately, judges are not endowed with such malleable wills as to be improperly swayed by the opinions of the Executive or Congress.[46] This indepen-

---

**45.** For example, in *United States v. Working,* 287 F.3d 801 (9th Cir.2002), the prosecutor twice successfully appealed the sentencing court's entry of downward departure. Presumably, the prosecutor had to report the adverse sentencing decision to the Appellate Section, which would have required disclosure of the details of the case (and, most likely, the identity of the sentencing judge), before appealing to the Ninth Circuit.

**46.** Just as the Executive and Legislative Branches make their views known to the Ju-

diciary, the Judiciary often expresses its opinion as to the merits of or need for certain legislation. Indeed, Congress frequently seeks judicial input, particularly on matters concerning the Judiciary. *See* 2003 Chief Justice Rehnquist, Year–End Report on the Federal Judiciary, Released January 1, 2004, available at www.supremecourtus.gov (last visited on January 2, 2004). Perhaps if Congress had taken the perspective of the Judiciary into account before passing Title IV, the negative reaction from judges and legal com-

dence flows in no small part from the fact that judges are appointed for life and cannot have their compensation "diminished during their Continuance in Office." U.S. Const. art. III, § 1. Put simply, life tenure "is designed to (and does) liberate judges from current politics." Judge Frank H. Easterbrook, *Presidential Review*, 40 Case West. Res. L.Rev. 905, 929 (1990). It protects judges from removal for judicial acts, that is, their rulings from the bench, and thereby allows for impartial and reasoned judgments.[47] *Thomas*, 473 U.S. at 582–83, 105 S.Ct. 3325; *United States v. Hatter*, 532 U.S. 557, 567, 121 S.Ct. 1782, 149 L.Ed.2d 820 (2001). So, too, "the permanent tenure by which the appointments are held" in the Judiciary soon "destroy[s] all sense of dependence on the authority conferring them." The Federalist No. 51 at 348 (James Madison) (J. Cooke ed., 1961). These constitutionally-imposed safeguards,

by design, tend to defect whatever intimidation or coercion the Executive and Legislative Branches might attempt to exercise against the Judiciary.[48]

In summary, the provisions of Title IV, considered separately or in whole, differ in detail and degree but not in substance from the Reform Act. As with the Reform Act, nothing in Title IV "creates any coercive power over members of the Judicial Branch and [the Court] construe[s] the statute as affording none," *Mistretta*, 488 U.S. at 406 n. 28, 109 S.Ct. 647.

■■■ This is not to say that Congress is free to assail Judicial independence. It may come to pass that Congress crosses the functional lines drawn by the Supreme Court and treads on the integrity of the Judicial Branch. In that event, the separation of powers expressed in the Constitution will present an impassible barrier. But Title IV, whatever its real or imagined policy failings, does not go so far.[49]

---

mentators toward the legislation would have been less pronounced. *See id.*

**47.** The political precedent set by the trial and acquittal of Justice Samuel Chase "has governed to this day: a judge's judicial acts may not serve as a basis for impeachment." Remarks of the Chief Justice, *supra* n. 39. But this rule

> does not mean that Congress cannot change the rules under which judges operate. Congress establishes the rules to be applied in sentencing; that is a legislative function. Judges apply those rules to individual cases; that is a judicial function. There can be no doubt that collecting information about how the sentencing guidelines, including downward departures, are applied in practice could aid Congress in making decisions about whether to legislate on these issues. There can also be no doubt that the subject matter of the question, and whether they target judicial decisions of individual federal judges, could amount to an unwarranted and ill-conceived effort to intimidate individual judges in the performance of their judicial duties. We must hope that these inquiries are designed to obtain information in the aid of congressional legislative func-

tion, and will not trench upon judicial independence.

Remarks of the Chief Justice, *supra* n. 39.

**48.** To be sure, the President's power to elevate judges to higher office, with the advice and consent of the Senate, may be an incentive to conform to political desires, particularly for young, aspiring judges. But it is not "incompatible with the functioning of the Judicial Branch that the President has the power to elevate federal judges from one level to another or to tempt judges away from the bench with Executive Branch positions. The mere fact that the President within his appointment portfolio has positions that may be attractive to federal judges does not, of itself, corrupt the integrity of the Judiciary." *Mistretta*, 488 U.S. at 374, 109 S.Ct. 647.

**49.** As Chief Justice Rehnquist stated,
> It is well settled that not only the definition of what acts shall be criminal, but the prescription of what sentence or range of sentences shall be imposed on those found guilty of such acts, is a legislative function—in the federal system, it is for Congress. Congress has recently indicated, rather strongly, by the Feeney Amendment, that it believes that there have been too many downward departures from the Sen-

# 1200

## CONCLUSION

The Court holds that the Guidelines Manual is not rendered unconstitutional by Title IV of the PROTECT Act. Defendant's Motion is therefore DENIED.

IT IS SO ORDERED.

tencing Guidelines. It has taken steps to reduce that number. Such a decision is for Congress, just as the enactment of the Sen-

tencing Guidelines nearly twenty years ago was.

Remarks of the Chief Justice, *supra* n. 39.