## In re SENTENCING.

### No. MISC 04–0024(JBW).

United States District Court,
E.D. New York.

Jan. 30, 2004.

### MEMORANDUM & ORDER

WEINSTEIN, Senior District Judge.

#### I. Introduction

The sentencing of criminal defendants has traditionally involved questions of fairness and justice. Judges charged with this duty approach the task with solemnity, recognizing its centrality to the rule of law and the credibility of the judiciary. *See, e.g., Koon v. United States,* 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996); Kate Stith & Jose Cabranes, Fear of Judging: Sentencing Guidelines in the Federal Courts (1998). With the advent of the United States Sentencing Commission and Guidelines in 1981, the ability of judges to fairly balance the complex web of particularities in an individual's case when meting out punishment was circumscribed. 28 U.S.C. § 991.

Passage of the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003 ("PROTECT Act") carries further the attenuation of the capacity of federal judges to do their work properly by requiring the Court of Appeals to review *de novo* a District Court's departure from the applicable Sentencing Guidelines range. Pub.L. No. 108–21, 117 Stat. 650 (2003). In effect, primary sentencing authority is shifted to the appellate judges whenever a trial court provides a lower sentence than do the Guidelines matrices. For a judge to exercise what amounts to original power to sentence without actually seeing the person being sentenced is contrary to American tradition, as recognized in *Koon.*

To assist the Court of Appeals judges in their new onerous task of more closely supervising trial judges in minimizing departures from the Guidelines—strictly construed against discretion—all sentencing hearings before the undersigned will be recorded by an appropriate video recording device. The appellate judges can then observe the actual people they are sentencing. The alternative, to have all the parties and their witnesses appear in the appeals court so that they can be seen and heard—a *sine qua non* for proper *de novo* sentencing review—would be too awkward and time consuming.

#### II. Sentencing Procedure

In almost all criminal cases in federal courts, the defendant now accepts a plea bargain from the government. *See United States v. Speed Joyeros, S.A.,* 204 F.Supp.2d 412, 417 (E.D.N.Y.2002) ("The virtual elimination of federal criminal trials, substituting administrative decisions not to prosecute or pleas of guilty, has substantially changed our federal criminal law system."). "Increased prosecutorial discretion and power have raised the percent of guilty pleas from 86% of all federal convictions in 1971 to 95% in 2001." *Id.; see also* Adam Liptak, *U.S. Suits Multiply, But Fewer Ever Get to Trial, Study Says,* N.Y. Times, Dec. 14, 2003 at A1. The modern judge and his or her law clerks spend far more time with the Sentencing Guidelines Manual than the Federal Rules of Evidence or Criminal Procedure. As a consequence, sentencing hearings routinely conducted following the entering of a guilty plea are the critical events in criminal prosecutions.

Rule 32 of the Federal Rules of Criminal Procedure requires that the court receive a presentence report in advance of the sentencing hearing. The presentence report contains a recitation of the defendant's "history and characteristics" including criminal back-

ground, family history, medical and psychological history and other pertinent facts. Fed.R.Crim.P. 32(d). The presentence report is indispensable, but it remains a record, purposefully written in a lifeless, "nonargumentative" style. *Id.*

Those attending a sentencing hearing typically include the defendant and defendant's counsel, an Assistant United States Attorney, a probation officer (who prepared the presentence report), a court reporter, the judge, and the family, friends, employers, and other witnesses for the defendant and for the government. If the defendant is in custody, he or she is brought to court clad in prison garb, under the watchful eye of the United States Marshals. Otherwise, the defendant arrives in civilian attire. The closest family members are invited to sit with the defendant so that the court may observe them and interrogate them if necessary, and so that they and the defendant can furnish each other with emotional support. Given that the majority of defendants are charged with drug crimes, there is rarely a tangible "victim" in the court pursuant to Rule 32(i)(4)(B).

In accordance with Rule 32, defense counsel, the defendant, the prosecutor and the victim (if present) are given opportunities to speak. *Id.* at 32(i). If a motion for departure is being heard, the defense presents its case with testimony from at least the defendant. The government is then afforded the opportunity to present its position. Grounds for departure are often based on a mix of circumstances or characteristics, some of which are readily observable by the court: familial circumstances, *see* U.S.S.G. § 5H1.6, disabilities, *see* U.S.S.G. § 5H1.4, and physical stature indicating the enhanced possibility of sexual abuse in prison, *see id.; see also* § 5K2.10, among others. The court then imposes a sentence "without unnecessary delay." *Id.* at 32(b).

In a substantial number of cases an adjournment is necessary so that supporting documents and photographs of family and living conditions can be obtained from abroad. At times adjournments of a year or more are needed so that the defendant can demonstrate rehabilitation. *See United States v. K,* 160 F.Supp.2d 421, 426 (E.D.N.Y.2001) ("Adjournment of sentence is permitted to allow the court to determine defendant's post–offense, presentence rehabilitation and to explore and consider a full range of appropriate sentencing alternatives.").

## III. PROTECT Act and Its Consequences

### A. PROTECT Act

The PROTECT Act's main features include implementing a national Amber Alert communication system, providing judges with the discretion to increase the term for supervision of released sex offenders up to a maximum of life, and extending the statute of limitations for child abductions and sex crimes to the life of the child victim.

Included in this Act is the Feeney Amendment, applying to all types of cases; it is not directed particularly at sex offender cases. Among other matters, it restricts the circumstances in which a judge may depart from the Sentencing Guidelines, and it requires *de novo* appellate review of departures, normally downward. Pub.L. No. 108–21, § 401; *cf. United States v. Mellert,* 2003 WL 22025007 (N.D.Cal. July 30, 2003) (criticizing the PROTECT Act).

The relevant provision states that "the court of appeals shall review *de novo* the district court's application of the guidelines to the facts." *Id.* at § 401. First, *de novo* review applies when the district court "fail[s] to provide the written statement of reasons" for the departure. *Id.* Second, if the sentence is not consistent with sections 3553(a)(2) and (b) of title 18 of the United States Code (as amended) or if it is "not justified by the facts of the case," the appeals court will utilize its *de novo* power to reject the sentence. *Id.* The PROTECT Act will routinely require *de novo* appellate review in cases in which a district court judge departs from the Sentencing Guidelines without the government's consent even where the departure is justified as a matter of law.

### B. Standard of Review

Prior to the enactment of the PROTECT Act, the Court of Appeals reviewed a district court's departures from the sentencing

guidelines under an "abuse of discretion" standard. *See Koon v. United States,* 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). Under the abuse of discretion standard, the Court of Appeals for the Second Circuit reviewed only "those reasons articulated by the district court at the time of sentencing." *United States v. Evans,* 352 F.3d 65 (2d Cir.2003). The formal test for reviewing a downward departure was "whether the circumstances relied upon to justify a downward departure are so far removed from those found exceptional in existing case law that the sentencing court may be said to be acting outside permissible limits; then, and only then, should we rule that it has misused its discretion." *United States v. Middleton,* 325 F.3d 386, 389 (2d Cir.2003).

In *Zervos v. Verizon New York, Inc.,* the Court of Appeals for the Second Circuit clarified the meaning of *de novo* review: "When we review a district court's decision *de novo,* we take note of it, and study the reasoning on which it is based. However, our review is independent and plenary; as the Latin term suggests, we look at the matter anew, as though it had come to the courts for the first time." 252 F.3d 163, 168 (2d Cir.2001). Thus, under the PROTECT Act, the members of the appeals court will in effect sit as sentencing judges when hearing an appeal from a departure. *See, e.g., United States v. Mallon,* 345 F.3d 943, 946 (7th Cir.2003) ("Instead of one district judge, three appellate judges now decide whether a departure is justified.").

### C.  The Necessity of Video Recordings

The PROTECT Act's mandate of de novo review of downward departures dictates that the Court of Appeals act in effect as a sentencing court. *See, e.g., United States v. Stultze,* 356 F.3d 261, 2004 WL 64958 (2d Cir.2004) ("Although discussion of the PROTECT Act is left for another day, we cannot help noting that district courts enjoy, under the Supreme Court's guidance, a distinct institutional advantage over appellate courts in determining sentences. This follows because of the vastly greater number of sentencing cases they are required to rule upon, only a small percentage of which are ever appealed.

To move the various appellate courts from their traditional function of reviewing to the front lines of determining sentences *de novo,* will certainly at the least undermine the Sentencing Commission's laudable goal of eliminating unjustified disparities in sentencing.") (footnote omitted). The sentencing hearing normally requires that the defendant be observed for credibility, mental astuteness, physical characteristics, ability to withstand the rigors and dangers of incarceration, and a myriad other relevant factors. In many instances, it is necessary to observe the employer's and familial ties to the defendant. A judge applies mental impressions of many tangible and intangible factors when imposing a sentence. *See, e.g., United States v. Lara,* 905 F.2d 599 (2d Cir.1990) (affirming district court's downward departure based in part on physical observations). Many of these factors do not appear in the transcript.

The defendant's words, his facial expressions and body language, the severity of any infirmity, the depth of his family's reliance, or the feebleness of his build cannot be accurately conveyed by a cold record. Many defendants are ill educated and inarticulate. They do not have the intellectual capacity to articulate, as might a great novelist, what is in their hearts. They are, after all, mere people.

*De novo* review requires that judges of the Court of Appeals conduct a hearing as "though [the defendant] had come to the courts for the first time." *Zervos,* 252 F.3d at 168. It is unlikely that the Court of Appeals judges would elect to require a criminal defendant to appear in the appellate courtroom so its judges could in fact revisit the sentence *de novo.* A proceeding as important to the criminal justice system as the meting out of punishment, however, requires more than a mere review of the printed record. A *de novo* review would be factually deficient without a video record of the district court's sentencing hearing.

Use of a video recording does not solve completely the problem of fairly applying critical subtle factors in deciding the fate of a fellow human being. In those rare circumstances when cases are tried, judges observe the defendant for longer time periods than

are available during sentencing hearings and can apply what they have observed when sentencing. But, since cases are rarely tried anymore, this limitation is not a serious issue. *See, e.g., Speed Joyeros, S.A.,* 204 F.Supp.2d at 417.

This order does not run afoul of the provision against the photographing or broadcasting of criminal proceedings in the federal courts. Fed.R.Crim.P. 53. Rule 53 was amended in 2002 with an emphasis on modern technologies, but the Committee chose not to expand the ban on photography to modern recording devices. *See* Fed. R. Crim P. 53 advisory committee's notes. The "videotape is more akin to a judicial record than a violation of the ban on cameras in a federal courtroom." *United States v. Berger,* 990 F.Supp. 1054, 1057 (C.D.Ill.1998).

The sentencing video recording kept in and under the control of the trial court and appellate court does not constitute a broadcast. *See United States v. McVeigh,* 931 F.Supp. 753, 755 (D.Colo.1996) (holding that the public distribution of audio recordings is the "functional equivalent of a broadcast"); *United States v. Kerley,* 753 F.2d 617 (7th Cir. 1985); *United States v. Hastings,* 695 F.2d 1278 (11th Cir.1983); *see also* Webster's Third International Dictionary (1967) (defining a broadcast as the "act of making widely known" or "radio or television transmission especially for general use").

### IV. Conclusion

*De novo* appellate review of a district court's departure from the Sentencing Guidelines is deficient without a video record of the sentencing proceedings. All sentencing hearings conducted by the undersigned shall be recorded by a video device. The video record will be kept under control of the Clerk of the court. It shall chronicle the defendant's observable demeanor during the hearing and capture, as much as it is possible to do so, the real world humanity that the district court judge confronts.

The video record shall be stored on a video cassette, digital video disc or other similar device. The video recording will not replace the transcript, which will continue to be prepared.

Defendants, any witnesses or the government shall have the option of refusing a video recording of all or part of the sentencing hearing.

Counsel, reporters and other interested persons will be permitted to view and listen to the video in court. To avoid the risk of inadvertent broadcasting in violation of federal court policy, they will not be permitted to copy it or remove it from the courthouse. It will be made available by the Clerk of this court to the Court of Appeals on the request of that court.

Since the equipment is already at hand, and law clerks present can handle it, the additional costs will be minimal.

SO ORDERED.