**UNITED STATES of America,**

v.

**Richard DETWILER, Defendant.**

**No. CR 03–372–PA.**

United States District Court,
D. Oregon.

Oct. 5, 2004.

Karin Immergut, United States Attorney, Gregory Nyhus, Assistant United States Attorney, Portland, OR, for the United States.

Ellen C. Pitcher, Thomas J. Hester, Federal Public Defender's Office, Portland, OR, for Defendant Richard Detwiler.

## OPINION AND ORDER

PANNER, District Judge.

Pending before the court is Defendant's motion to declare the Feeney Amendment unconstitutional and to impose sentence under the pre-Feeney version of the federal Sentencing Guidelines. That motion is granted in part. I hold that:

1. The federal Sentencing Guidelines system, in its present form, is unconstitutional because it violates the separation of powers doctrine.

2. The defects are not severable.

3. The federal Sentencing Guidelines will be treated as true guidelines, and not mandates, when imposing sentence in this and all future cases, pending further directions from a higher court or the Congress.

### Discussion

The failings of the federal Sentencing Guidelines (the "Guidelines") have been well documented by others. *See, e.g., United States v. Green*, —— F.Supp.2d ——, 2004 WL 1381101 (D.Mass.2004).

If the only flaw in the Guidelines was that they represent poor public policy, and have never worked as advertised, I would be duty-bound to continue applying the Guidelines, as I have done for many years. A law is not unconstitutional simply because it may be unwise.[1]

---

1. The converse is also true. "It is a grave mistake to retain a policy just because a court finds it is constitutional .... Few misconceptions about government are more mischievous than the idea that a policy is sound simply because a court finds it permissible." Remarks of Justice Kennedy to the American Bar Association Annual Meeting, August 9, 2003, *reprinted* at 16 FED. SENT. R. 126 (Dec. 2003), *available at* http://www.supremecourtus.gov/publicinfo/speeches/sp_08-09-03.html.

However, Defendant contends that recent Congressional actions render the federal Sentencing Guidelines system, or parts thereof, unconstitutional. I begin with Defendant's contentions regarding the separation of powers doctrine.

### A. *Mistretta's Treatment of the Separation of Powers Issue*

"[W]ithin our political scheme, the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty." *Mistretta v. United States,* 488 U.S. 361, 380, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). In arguing for ratification of the Constitution, James Madison referred to separation of powers as "the sacred maxim of free government." THE FEDERALIST No. 47, p. 308 (C. Rossiter ed.1961). "The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many ... may justly be pronounced the very definition of tyranny." *Id.* at 301.

Consequently, "our Constitution mandates that 'each of the three general departments of government [must remain] entirely free from the control or coercive influence, direct or indirect, of either of the others.'" *Mistretta,* 488 U.S. at 380, 109 S.Ct. 647 (quoting *Humphrey's Executor v. United States,* 295 U.S. 602, 629, 55 S.Ct. 869, 79 L.Ed. 1611 (1935)). However, "[w]hile the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government." *Mistretta,* 488 U.S. at 381, 109 S.Ct. 647 (citation omitted). Consequently, the Supreme Court has focused upon ensuring adequate checks and balances, and that each Branch jealously guards its own powers and resists encroachment by the others.

"[T]he greatest security," wrote Madison, "against a gradual concentration of the several powers in the same department, consists in giving to those who administer each department, the necessary constitutional means, and personal motives, to resist encroachments of the others." *Id.* at 381–82, 109 S.Ct. 647 (quoting THE FEDERALIST No. 51).

It is this concern of encroachment and aggrandizement that has animated our separation-of-powers jurisprudence .... [W]e have not hesitated to strike down provisions of law that either accrete to a single Branch powers more appropriately diffused among separate Branches or that undermine the authority and independence of one or another coordinate Branch. For example, just as the Framers recognized the particular danger of the Legislative Branch's accreting to itself judicial or executive power, so too have we invalidated attempts by Congress to exercise the responsibilities of other Branches or to reassign powers vested by the Constitution in either the Judicial Branch or the Executive Branch * * * * By the same token, we have upheld statutory provisions that to some degree commingle the functions of the Branches, but that pose no danger of either aggrandizement or encroachment. *Id.* at 382–83, 109 S.Ct. 647 (citations omitted).

In affirming the constitutionality of the Sentencing Guidelines concept—at least in the abstract—*Mistretta* overruled two objections: first, that Congress had delegated excessive legislative discretion to the Sentencing Commission, and second, that Congress had violated the separation of powers doctrine by supposedly allowing the Judicial Branch to exercise executive and legislative powers, and also by authorizing federal judges to serve as members of the Sentencing Commission. *Id.* at 412, 109 S.Ct. 647.

*Mistretta* did not consider whether the federal Sentencing Guidelines system, in its present form, violates the separation of

powers doctrine by aggrandizing the Executive Branch at the expense of the Judicial Branch. In many respects, this is the opposite of the contention advanced in *Mistretta*. That this court is even giving serious consideration to such a challenge, a mere 15 years after that decision, illustrates just how far the federal Sentencing Guidelines system today has strayed from the theoretical concept approved in *Mistretta*.

Central to the decision in *Mistretta* was the premise that the Sentencing Commission was a part of the Judicial Branch, performing tasks consistent with the historic role of that branch:

> Prior to the passage of the Act, the Judicial Branch, as an aggregate, decided precisely the questions assigned to the Commission: what sentence is appropriate to what criminal conduct under what circumstances. It was the everyday business of judges, taken collectively, to evaluate and weigh the various aims of sentencing and to apply those aims to the individual cases that came before them. The Sentencing Commission does no more than this, albeit basically through the methodology of sentencing guidelines, rather than entirely individualized sentencing determinations. Accordingly, in placing the Commission in the Judicial Branch, Congress cannot be said to have aggrandized the authority of that Branch or to have deprived the Executive Branch of a power it once possessed.

*Id.* at 395, 109 S.Ct. 647.

Indeed, the Court noted, "[i]n the field of sentencing, the Executive Branch never has exercised the kind of authority that Congress has vested in the Commission." *Id.* at 387 n. 14, 109 S.Ct. 647. In a footnote, the Court then observed that:

> [H]ad Congress decided to confer responsibility for promulgating sentencing guidelines on the Executive Branch, we might face the constitutional questions whether Congress unconstitutionally had assigned judicial responsibilities to the Executive or unconstitutionally had united the power to prosecute and the power to sentence within one Branch. Ronald L. Gainer, Acting Deputy Assistant Attorney General, Department of Justice, testified before the Senate to this very effect: "If guidelines were to be promulgated by an agency outside the judicial branch, it might be viewed as an encroachment on a judicial function...."

*Id.* at 391 n. 17, 109 S.Ct. 647 (citation omitted).

Recent developments, including enactment of the "Feeney Amendment," Pub.L. No. 108–21, § 401 (2003), require this court to confront the questions posed in footnote 17 of *Mistretta*.

## B. *Enactment of the Feeney Amendment*

Nominally sponsored by a freshman Congressman, the Feeney Amendment actually was authored by Attorney General Ashcroft's subordinates at the Department of Justice.[2] As introduced, the Feeney Amendment would have eliminated the sentencing court's ability to depart downward, unless a departure was requested by the prosecutor or else appeared on a short list of expressly authorized departures. H.R. REP. No. 48 (March 25, 2003). Such a rule would defeat the principal purpose

---

**2.** Laurie Cohen & Gary Fields, "Ashcroft Intensifies Campaign Against Soft Sentences by Judges," WALL STREET JOURNAL (Aug. 6, 2003), *available at* 2003 WL–WSJ 3976244 ("Mr. Feeney himself says he was simply the 'messenger' of the amendment bearing his name, which was drafted by two Justice Department officials"); Skye Phillips, Note, *Protect Downward Departures: Congress and the Executive's Intrusion Into Judicial Independence*, 12 JOURNAL OF LAW AND POLICY 947, 983 (2004).

of downward departures, which is to address unique circumstances *not* already covered by the Guidelines. *See Koon v. United States*, 518 U.S. 81, 92–93, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).

The Feeney Amendment also (1) directly revised various Guidelines, an unprecedented action for Congress[3]; (2) altered the standard for appellate review of departures, thereby abrogating much of the holding in *Koon;* (3) gave prosecutors the power to deny defendants the third point for acceptance of responsibility; (4) gave prosecutors the power to establish fast-track programs offering defendants a lower sentence, provided the defendant quickly pleads guilty and waives all rights, including the right to obtain discovery, suppress unlawful seizures, and to seek relief for ineffective assistance of counsel; and (5) made other significant revisions to the Guidelines scheme.

In addition, under the guise of "improved data collection," the Feeney Amendment requires that the House and Senate Judiciary Committees, and the Attorney General, be notified each time a judge departs downward, unless that departure was requested by the prosecutor. In particular, the report must include the "identity of the sentencing judge." H.R. REP. No. 48, *supra.*

The Feeney Amendment was abruptly added, on the floor of the House, to the "PROTECT Act," an unrelated but popular bill to fund an "Amber Alert" system. No advance notice was given, no hearings were held, and there was no opportunity for meaningful debate or to refute the arguments (and allegedly, misinformation) that were cited as justification for the Amendment.[4] Although the Feeney Amendment directly impacted the Sentencing Commission, that body was not informed of the Amendment in advance, let alone consulted. Cohen & Fields, *supra;* Phillips, *supra,* at 986–97. The Judicial Branch was not consulted either.[5]

Since the PROTECT Act had already cleared both houses of Congress, the lone remaining hurdle[6] was a conference committee. As news of the Feeney Amendment began to circulate, a firestorm erupted. Alan Vinegrad, *The New Federal Sentencing Law*, 15 FED. SENT. R. 310 (June 2003).

---

**3.** It is not uncommon for Congress to enact legislation that has the effect of superseding an administrative regulation, or that effectively compels the agency to revise its regulation to remain consistent with the applicable statutes. It is unusual, however, for Congress to directly amend administrative regulations, *e.g.* "Section 12, Part 24 of Title 53 of the Code of Federal Regulations is revised to read as follows . . . ." Yet that is precisely what Congress has done here. These regulations are codified in the Guidelines Manual instead of in the CFR, but the result is the same.

**4.** *See* H.R. REP. No. 48 (limiting debate on the Amendment to a *total* of 20 minutes, including statements from proponents); 150 CONG. REC. S8572–01, S8573 (daily ed. July 21, 2004) (remarks of Sen. Leahy) (the Feeney Amendment "was forced through the Congress with virtually no debate and without meaningful input"); 149 CONG. REC. S5113–01,

S5116 (daily ed. April 10, 2003) (remarks of Sen. Kennedy) (his request for a hearing was denied) and at S5133 ("This legislation overturns a unanimous Supreme Court decision, without a single day, hour, or minute of hearings.")

**5.** *See* News Release, Administrative Office of the United States Courts, Sept. 23 2003 ("Because the Judiciary and the U.S. Sentencing Commission were not consulted prior to enactment, the [Judicial] Conference [has] voted to support repeal of the following provisions of the . . . PROTECT Act"), *available at* http://www.uscourts.gov/Press_Releases/jc903.pdf.

**6.** Technically, the bill also required the President's signature, but this was a foregone conclusion since the Executive Branch authored the Feeney Amendment.

Even Chief Justice Rehnquist weighed in, warning Congress (in his capacity as Chairman of the Judicial Conference[7]) that:

> The Judicial Conference believes that this legislation, if enacted, would do serious harm to the basic structure of the sentencing guideline system and would seriously impair the ability of courts to impose just and responsible sentences. Before such legislation is enacted there should, at least, be a thorough and dispassionate inquiry into the consequences of such action.

149 CONG. REC. at S5120.

Congress did not pause its headlong rush. The Conference Committee did confine the prohibition upon downward departures to certain offenses. However, the balance of the Feeney Amendment remained intact. Important new provisions also were added during a back-room meeting, which (1) mandated life imprisonment without parole for a second conviction on various sex offenses; (2) required the Commission to revise the Guidelines to "ensure that the incidence of downward departures are substantially reduced;" (3) prohibited the Commission from recognizing any new permissible grounds for downward departures during the ensuing two years; (4) permanently prohibited the Commission from revising the Guidelines in any manner that would reduce the sentencing range for certain specified offenses; and (5) dramatically altered the composition of the Sentencing Commission.

Curiously, the latter three provisions are not mentioned in the explanatory section of the Conference Committee report given to members of Congress before they voted on the bill. *See* H.R. CONF REP. 108–066, *reprinted at* 149 CONG. REC. H2950, 2965 (daily ed. April 9, 2003). That is a serious omission.

This legislation, of vital importance to the Judicial Branch, was "enacted without any consideration of the views of the Judiciary." Chief Justice William Rehnquist, *2003 Year–End Report on the Federal Judiciary.*[8] The public likewise had no opportunity to be heard.

This stealth route clearly was intended to prevent close scrutiny of the Feeney Amendment, or a fair opportunity to oppose the measure. No emergency mandated acting in such a precipitous manner, without consulting a coordinate Branch of government or allowing opportunity for public input or Congressional debate. The legislative record also is replete with remarks by some members of Congress, and the Attorney General's deputies, expressing hostility toward the Judicial Branch and toward judges who fail to decide cases in the manner favored by those individuals.

Chief Judge Young, a respected trial judge, has labeled passage of the Feeney Amendment as "the saddest and most counterproductive episode in the evolution of federal sentencing doctrine." *Green,* 2004 WL 1381101 at *12.

### C. The Feeney Amendment Compels Re–Examination of Mistretta

The original structure of the Sentencing Commission was described in *Mistretta:*

> The Commission is established "as an independent commission in the judicial

---

7. The Judicial Conference includes the Chief Justice of the United States Supreme Court, the chief judges of each judicial circuit and of the Court of International Trade, and one district judge from each circuit. 28 U.S.C. § 331.

8. *Available at* http:/ /www.supremecourtus.gov/publicinfo/year-end/year-endreports.html.

branch of the United States." It has seven voting members (one of whom is the Chairman) appointed by the President "by and with the advice and consent of the Senate." "At least three of the members shall be Federal judges selected after considering a list of six judges recommended to the President by the Judicial Conference of the United States." No more than four members of the Commission shall be members of the same political party. The Attorney General, or his designee, is an ex officio nonvoting member. The Chairman and other members of the Commission are subject to removal by the President "only for neglect of duty or malfeasance in office or for other good cause shown." Except for initial staggering of terms, a voting member serves for six years and may not serve more than two full terms. *Mistretta,* 488 U.S. at 368–69, 109 S.Ct. 647 (footnote and internal citations omitted).

The Feeney Amendment, in its final form, significantly alters the composition of the Sentencing Commission. Prior to that Amendment, no less than three of the Commission's seven voting members had to be selected from the ranks of federal judges. *Former* 28 U.S.C. § 991(a) (2002). This ensured that the views of the Judicial Branch would be represented and that the Commission would have the benefit of the judiciary's extensive experience in sentencing matters. The presence of at least three federal judges, who enjoy lifetime tenure and whose future careers are less dependent upon the prevailing political winds, also helped provide the Commission with a small measure of insulation from political pressure. The President was required to consider the recommendations of the Judicial Conference in selecting the judge nominees.

Post–Feeney, the President need not nominate *any* judges to the Commission, Pub.L. No. 108–21, § (n)(1), 117 Stat. 650, 676, even though the Commission ostensibly is part of the Judicial Branch. The President may fill every seat with political appointees, deputy Attorney Generals, or others whom the Executive Branch favors.[9] The Feeney Amendment also prohibits judges from ever occupying more than three seats on the Commission, thus ensuring that judges will never again comprise a majority of the voting membership of the Commission. *Id.* When selecting Commission members, the President need not consider the views of the Judicial Conference unless he voluntarily chooses to nominate federal judges.

We are thus left with a strange creature that is nominally lodged within the Judicial Branch, and purports to be performing duties of a judicial nature, yet need contain no judges, does not answer to anyone in the Judicial Branch, and into which the Judicial Branch is assured no input, whether substantively or in selecting the members of the Commission.

This absence of judicial input was deliberate. Rep. Sensenbrenner, Chairman of the House Judiciary Committee and a key member of the Conference Committee that made this change, reportedly justified the Amendment by saying, "We don't want to have the Commission packed with Federal judges that have a genetic predisposition to hate any kind of sentencing guidelines."[10] 149 CONG. REC. at S5146.

---

**9.** The rule that no more than four members of the Commission may be members of the same political party, 28 U.S.C. § 991(a), offers no real obstacle. A prospective nominee could simply re-register as non-partisan.

**10.** I say "reportedly" because I could not obtain a transcript of the Committee's discussions. This account of Rep. Sensenbrenner's remarks was provided by Senator Leahy on the floor of the Senate.

The alterations to the Sentencing Commission effected by the Feeney Amendment require re-examination of a fundamental premise of *Mistretta*, namely, that the Sentencing Commission is part of the Judicial Branch.

I see no principled basis on which to distinguish the Sentencing Commission, post-Feeney, from the myriad of other administrative agencies that populate the Executive Branch. Despite this, the Sentencing Commission is performing tasks that never have been within the province of the Executive Branch. *See Mistretta*, 488 U.S. at 387 n. 14, 109 S.Ct. 647.

Justice Scalia's dissenting opinion in *Mistretta* declared:

> I am sure that Congress can divide up the Government any way it wishes, and employ whatever terminology it desires, for *non* constitutional purposes—for example, perhaps the statutory designation that the Commission is "within the Judicial Branch" places it outside the coverage of certain laws which say they are inapplicable to that Branch ... For such statutory purposes, Congress can define the term as it pleases. But since our subject here is the Constitution ... the Court must ... decide for itself where the Commission *is* located for purposes of separation-of-powers analysis.

*Id.* at 422–23, 109 S.Ct. 647 (emphasis in original).

That is surely correct. "Our separation-of-powers analysis does not turn on the labeling of an activity .... Rather, our inquiry is focused on the 'unique aspects of the congressional plan at issue and its practical consequences in light of the larger concerns that underlie Article III.'" *Mistretta*, 488 U.S. at 393, 109 S.Ct. 647 (citation omitted).

For separation of powers purposes, if it walks like a duck, and quacks like a duck, then it's a duck, even if Congress chooses to label it a cow. The Plan of the Constitution cannot be circumvented through mere labels.

The practical consequence of the Feeney Amendment is that, regardless of what it may say on the office door, the Sentencing Commission is now a captive of the Executive Branch. Any involvement by the Judicial Branch in the Commission's work is solely by the grace of the Executive Branch.

**D. *The Federal Sentencing Guidelines System, as Modified by the Feeney Amendment, Violates the Separation of Powers Doctrine By Uniting the Power to Prosecute and the Power to Sentence, and by Aggrandizing the Executive Branch while Diminishing the Judicial Branch***

■ The Executive Branch's newfound domination of the Sentencing Commission raises grave constitutional concerns. The Executive Branch initiates and prosecutes criminal cases. It is a party to every federal criminal proceeding. To permit the same body to serve as prosecutor, as advocate for the sovereign, and also to determine the penalty for the offense, is contrary to fundamental notions of liberty and justice. This harkens back to the excesses of the English crown against which the founders of this nation rebelled. It was no accident that measures to protect the independence of the judiciary, and of the jury, were included in the Constitution and Bill of Rights. As Congress itself recognized when enacting the Guidelines:

> Any suggestion that the Executive Branch should be responsible for promulgating the guidelines would present troubling constitutional problems. More importantly, it would fundamentally alter the relationship of the Congress and the Judiciary with respect to sentencing policy and its implementation. Giving

such significant control over the determination of sentences to the same branch of government that is responsible for the prosecution of criminal cases is no more appropriate than granting such power to a consortium of defense attorneys.

H.R. REP. 98–1017, at 94–95 (Sept. 13, 1984).[11]

The Feeney Amendment effectively adopts the very approach that Congress had previously rejected as "inappropriate" and "present[ing] troubling constitutional problems." This abrupt reversal occurred without a hearing or public debate, without any notice, and without even acknowledging the earlier position.

Consequently, this court now must confront the question foreseen in footnote 17 of *Mistretta:* "whether Congress unconstitutionally ha[s] assigned judicial responsibilities to the Executive or unconstitutionally ha[s] united the power to prosecute and the power to sentence within one Branch." I conclude that Congress has done both.

Congress could not, consistent with the separation of powers doctrine, dispense with the Sentencing Commission entirely, and delegate to the Attorney General sole responsibility for writing and revising the Sentencing Guidelines. Such a measure would unify the power to prosecute and to sentence within the same body, and aggrandize the power of the Executive Branch at the expense of the Judicial Branch.

While that may appear an extreme example, the present circumstance is but a few small steps removed. The Feeney Amendment does not delegate directly to the Attorney General the power to write the Sentencing Guidelines; he is, individu-ally, only an *ex officio* member of the Commission. Nevertheless, the Feeney Amendment gives the Executive Branch—the prosecutorial arm of the government—effective control over the Sentencing Commission and, therefore, over the Sentencing Guidelines. The President may, if he chooses, fill every seat on that Commission with federal prosecutors, or deputy attorneys general, or political operatives.

This concentration of sentencing power in the Executive Branch is unprecedented. "In the field of sentencing, the Executive Branch never has exercised the kind of authority that Congress has vested in the Commission." *Mistretta,* 488 U.S. at 387 n. 14, 109 S.Ct. 647. Rather, formulation of sentencing guidelines is consistent with tasks that the Judicial Branch historically has performed. *Id.* at 395, 109 S.Ct. 647. For that reason, *Mistretta* concluded that assigning those tasks to the Judicial Branch did not aggrandize the authority of the Judicial Branch or deprive the Executive Branch of a power it once possessed. *Id.* at 395, 109 S.Ct. 647.

The reverse is now true. The Executive Branch has usurped control over the tasks that *Mistretta* viewed as historically within the realm of the Judicial Branch.

To be sure, sentencing has never been exclusively within the province of the Judicial Branch. *Id.* at 364, 109 S.Ct. 647. Congress has long influenced sentences by establishing maximum, and more recently minimum, penalties for criminal offenses. *Mistretta* accepted limited participation by the Executive Branch in the affairs of the Sentencing Commission, *e.g.,* the Attorney General is a non-voting member, and the President can remove Commissioners for cause. *Mistretta* also recognized that the Executive Branch historically had a role in

---

11. This Report accompanied the Sentencing Revision Act of 1984, H.R. 6012, 98th Cong., 2d Sess., one of several bills that culminated in passage of H.J. Res. 648, which became Pub.L. No. 98–473.

executing indeterminate sentences, and in deciding when an inmate was ready to be paroled. *Id.* at 364–66, 109 S.Ct. 647.[12]

Nevertheless, *Mistretta* emphasized that the Sentencing Commission was not exercising any power that the Judicial Branch did not already have, or that the Executive Branch had ever possessed. *Id.* at 387 n. 14, 395, 109 S.Ct. 647. Those powers and roles have now been usurped by the Executive Branch. The power and scope of the Executive Branch has been expanded, while that of the Judicial Branch is diminished commensurately, in violation of the separation of powers doctrine.

Furthermore, even assuming the sentencing power was historically divided among all three branches, that division of power has now been significantly disturbed by concentrating that power within one, or at most two, branches, to the exclusion of the Third Branch. The separation of powers doctrine protects not just against the exercise of powers belonging exclusively to another department, but also against measures that "accrete to a single Branch powers more appropriately diffused among separate Branches or . . . [that] undermine the authority and independence of one or another coordinate Branch." *Mistretta,* 488 U.S. at 382, 109 S.Ct. 647.

### E. *The Feeney Amendment Increases the Executive Branch's Power Over Sentencing*

The danger posed by the shift in control of the Sentencing Commission is exacerbated by other elements of the Feeney Amendment that enhance the power of the Executive Branch in sentencing matters, at the expense of the Judicial Branch, thereby concentrating within the same Branch both the power to prosecute and the power to sentence.

The Executive Branch, through the plea bargaining process, exerts considerable power over the sentence eventually imposed. In recent years, this power was greatly enhanced by the Sentencing Guidelines, by selective use of "relevant conduct" to enhance or reduce sentences, by the enactment of laws requiring mandatory minimum sentences, and by giving prosecutors, and only prosecutors, the power to initiate U.S.S.G. § 5K1.1 motions to reduce a sentence for "substantial assistance."

By design and in practice, the Guidelines also create a substantial disparity between the sentence imposed upon a defendant found guilty following a trial, versus the sentence that would be imposed if that same defendant pled guilty. The penalty for going to trial has become so high that, in some instances, it may border upon legal malpractice for a lawyer to allow her client to do so. During Fiscal Year 2002— just prior to enactment of the Feeney Amendment—an astonishing 98.7 percent of all criminal convictions in this district resulted from a plea, not a trial.[13] This trend towards negotiated dispositions enhances the power of the prosecutor to determine sentences by structuring the plea bargain.

Even before the changes made by the Feeney Amendment, many believed the pendulum had swung too far, and prosecutors had more power over sentencing matters than the judges who ostensibly decided and imposed those sentences.[14]

---

12. The sentencing court still set the maximum duration of any prison term, subject only to the statutory maximum and—either explicitly or indirectly—determined when the defendant could first be considered for parole. *See former* 18 U.S.C. § 4205(a) and (b).

13. United States Sentencing Commission, *Federal Sentencing Statistics by State, District,* and Circuit, available at http://www.ussc.gov/JUDPACK/2002/or02.pdf.

14. *See, e.g., United States v. Flores,* 336 F.3d 760, 766 (8th Cir.2003) (Bright, J., concurring) (presently, "much of the discretion in sentencing decisions unfortunately falls to persons far less qualified to judge an offender

The Feeney Amendment increases prosecutorial power further still, at the expense of the Judicial Branch. This court may no longer grant a defendant the third point for "acceptance of responsibility" unless the prosecutor initiates that request.[15] Pub.L. No. 108–21, § 401(g)(1)(A), 117 Stat. at 671. The opportunity for abuse is considerable, should a prosecutor be so inclined. For instance, the third point might be withheld from a defendant who insists upon reviewing discovery materials before deciding whether to plead guilty, or who annoys the prosecutor by moving to suppress the fruits of an illegal search.

Fear of retaliation might itself chill defense counsel's efforts. A prosecutor could also give the defendant an ultimatum: "accept this plea agreement within 24 hours or your sentence will be increased." A defendant has no effective recourse in the face of such an ultimatum.[16] Refusing to plead and going to trial is rarely an option, because a guilty verdict following a trial will almost always result in an even higher sentence.

The Feeney Amendment further undermines the authority and discretion of the sentencing judge by requiring *de novo* ap-

than the district judge. While we say the district judge sentences the offender, in fact, the prosecutor ... often has more input into the sentence to be imposed than does the district judge"); *United States v. Roberts,* 726 F.Supp. 1359, 1363 (D.D.C.1989) (the "de facto transfer of much of the responsibility for sentencing from impartial judges to prosecutors has ... disturb[ed] the due process balance essential to the fairness of criminal litigation"), *rev'd sub nom. United States v. Doe,* 934 F.2d 353 (D.C.Cir.1991); *United States v. Bethancurt,* 692 F.Supp. 1427, 1435 (D.D.C. 1988) ("This shift is aggravated by the fact that prosecutors are far more subject to political, career, and other pressures than are lifetime judges"); *United States v. Kikumura,* 918 F.2d 1084, 1119 (3d Cir.1990) (Rosenn, J., concurring) (the Guidelines have "replaced judicial discretion over sentencing with prosecutorial discretion"); Hon. Gerald Heaney, *The Reality of Guidelines Sentencing,* 44 St. Louis U.L.J. 293 (Spring 2000) (decisions by law enforcement officers, prosecutors, and probation officers preparing the presentence report "have a far greater impact on time served by a defendant than any decision made by the sentencing judge"); Albert Alschuler, *The Failure of Sentencing Guidelines: A Plea for Less Aggregation,* 58 U. Chi. L. Rev. 901, 926 (1991) ("The sentencing reform movement has not restricted sentencing discretion so much as it has transferred discretion from judges to prosecutors .... [In practice,] the guidelines do not set sentences; they simply augment the power of prosecutors to do so"); Jeffrey Standen, *The End of the Era of Sentencing Guidelines: Apprendi v. New Jersey,* 87 Iowa L. Rev. 775, 792 (Jan 2002) ("The

Guidelines magnified the importance of prosecutorial discretion at the expense of judicial discretion").

See also American Law Institute, *Model Penal Code: Sentencing Report,* p. 116 (April 11, 2003) ("[P]rosecutors in the federal system have gained unprecedented authority to influence sentencing outcomes"); Remarks of Justice Kennedy to the ABA Annual Meeting, August 9, 2003, *supra* note 1 (mandatory minimums can effectively "transfer ... sentencing discretion from a judge to an Assistant U.S. Attorney, often not much older than the defendant" even though the "trial judge is the one actor in the system most experienced with exercising discretion in a transparent, open, and reasoned way").

15. The supposed justification for this change is that the prosecutor is in the best position to determine whether the plea saved the government the expense of trial preparation. Pub.L. No. 108–21, § 401(g)(2)(B), 117 Stat. at 671. However, prior to the Feeney Amendment, sentencing judges gave considerable weight to the prosecutor's recommendation on this question anyway. No longer content to have an over-size seat at the table, the Executive Branch now insists upon owning the table outright.

16. There may be rare instances in which a court could intervene. *See Wade v. United States,* 504 U.S. 181, 185, 112 S.Ct. 1840, 118 L.Ed.2d 524 (1992) (federal court may review prosecutor's refusal to file substantial-assistance motion if the refusal was based on an unconstitutional motive such as race or religion).

pellate review of most sentencing decisions. Pub.L. No. 108–21, § 401(d)(2), 117 Stat. at 670. If the trial judge does not accede to the prosecutor's sentencing demands, the prosecutor may now renew his arguments before another panel of judges, only those judges will never actually see or hear the defendant, or any of the witnesses, and need give no deference to most of the sentencing court's determinations. *See In re Sentencing*, 219 F.R.D. 262 (E.D.N.Y.2004) (discussing impact of *de novo* appellate review of departures).

In addition, the Feeney Amendment gives the Attorney General power to create "fast-track" programs authorizing significant reductions in sentence in return for immediate guilty pleas. The Attorney General decides if such programs will be implemented, and where. Pub.L. No. 108–21, § 401(m)(2)(B), 117 Stat. at 675.

Finally, one of the most reprehensible features of the Feeney Amendment is the requirement that every downward departure, except one requested by the prosecutor, immediately be reported to the Attorney General, and the House and Senate Judiciary Committees—with particular emphasis upon reporting the "identity of the sentencing judge." Pub.L. No. 108–21, § 401(h) and (1), 117 Stat. at 672, 674–75. This has been widely construed as an attempt to coerce judges into following the prosecutor's sentencing recommendation.[17]

Giving the prosecutorial arm of the government control over the Sentencing Commission and, therefore, over the Sentenc-

ing Guidelines, is merely the culmination of a series of steps that have taken control over sentencing matters away from an independent judiciary and "vest[ed] it in the Department of Justice, which . . . is a partisan in our system of justice." *United States v. Mellert*, 2003 WL 22025007 at *2 (N.D.Cal.2003). The Feeney Amendment "takes a sledge hammer to the concept of separation of powers." 149 CONG. REC. at S5145 (remarks of Sen. Leahy).

Judge Young recently observed, "It may be that, taken together, the ways in which the Guidelines regime have transferred the power of sentencing to the Department [of Justice] add up to a joining of the power to prosecute and the power to sentence in one branch of the government." *Green*, 2004 WL 1381101 at *32. If anything, Judge Young exercised great restraint in describing the situation.

This concentration of power in the Executive Branch is troubling, as is the manner in which it occurred—a procedure calculated to prevent the judicial branch from defending its interests via the political process.

The Supreme Court has emphasized that each branch must have both the motive *and* also the "necessary constitutional means" to resist encroachments of the other branches. *Mistretta*, 488 U.S. at 381, 109 S.Ct. 647 (quoting James Madison).

The separation of powers doctrine is the principal constitutional means for the Judicial Branch to resist encroachment, when

---

17. *See* 150 CONG. REC. at S8573 (remarks by Sen. Leahy) (Feeney Amendment establishes "a judicial 'black list' to intimidate judges whose sentences were insufficiently draconian to suit the current Justice Department"); 149 CONG. REC. at S5133 (remarks by Sen. Kennedy) ("this is a blatant attempt to intimidate the judiciary. It says to judges you will be called on the carpet if you depart downward. Your name will be given to the Attorney General and he will report you to Con-

gress"); *United States v. Kirsch*, 287 F.Supp.2d 1005, 1006 (D.Minn.2003) ("If the Court were to depart . . . [it would be] report[ed] to the Attorney General . . . and Congress could call the undersigned to testify and attempt to justify the departure. This reporting requirement system accomplishes its goal: the Court is intimidated, and the Court is scared to depart"); *United States v. Mendoza*, 2004 WL 1191118 (C.D.Cal.2004) ("the threat, real or apparent, is blatantly present").

diplomatic and political efforts fail. The Judicial Branch cannot enact or veto legislation. It has no control over the budgets of the other Branches, or the power to nominate, confirm, or impeach their officials, or the power to conduct investigations and subpoena their officials to testify.

Courts are hesitant to declare an Act of Congress unconstitutional, and rightly so. So too, by temperament, training, and role, judges are not easily roused to the defense of their own Branch. Nonetheless, judges are duty-bound to act when the political balance established by our Constitution is threatened. It is not the power of judges, as individuals, that bears defending, but rather the tripartite system of government that the Framers of the Constitution established to safeguard our liberty as a people.

It may be argued that this accretion of power in the Executive Branch is merely the latest in a series of incremental steps. I cannot agree. The Feeney Amendment is different from the prior intrusions, both in breadth and intent. Working together, Congress and the Executive Branch carved up the Sentencing Commission as if it were a Thanksgiving turkey—with Congress amending the existing Guidelines while the Executive Branch seized control over the Commission—and otherwise mounted a direct assault upon the Third Branch of government. It is beyond dispute that the Feeney Amendment was aimed at chilling the exercise of judicial discretion, and making judges subservient to the will of Congress and the Attorney General, instead of following the laws and the Constitution.

Even if this power grab were merely the latest in a series of incremental steps, as some suggest, that would not alter the constitutional analysis.

James Madison once observed that "there are more instances of the abridgement of the freedom of the people, by gradual and silent encroachments of those in power, than by violent and sudden usurpations ...." Speech in the Virginia Convention (June 6, 1788), *reprinted at* 11 THE PAPERS OF JAMES MADISON, p. 79 (ed. R. Rutland & C. Hobson) (1977). Similarly, it was the *"gradual concentration* of the several powers in the same department" that Madison feared. THE FEDERALIST No. 51, p. 321 (emphasis added).

For too long, the Judicial Branch has remained silent in the face of repeated encroachments by the other two Branches. Like frogs in a simmering pot, we adjust to the new temperature, and complain among ourselves that it seems a tad warm, but then accept the new order of things, to repeat that process anew after the next encroachment. Unless a line be drawn somewhere, and soon, the independent federal judiciary that is the bulwark of our liberties, THE FEDERALIST No. 78 (A.Hamilton), pp. 469–70, will be relegated to just another historical footnote.

### F. *Defendant has Standing to Mount this Challenge and His Claims are Ripe*

■ The government argues that the separation of powers concerns raised by Defendant are but hypothetical perils that may never actually come to pass. A President could voluntarily choose to appoint some judges to the Sentencing Commission, albeit they can never constitute a majority. In theory, a President might decline to exercise his newly conferred powers to pack the Commission with prosecutors or political operatives. He might exercise self-restraint. Therefore, the government reasons, any challenge is premature.

I disagree. Surely the government does not seriously suggest that the Guidelines could be constitutional today, unconstitutional tomorrow, but perhaps constitutional

again the following year, depending upon which individuals the administration in power at the moment appoints to the Commission.

In *Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986), the Court addressed the constitutionality of the Gramm–Rudman–Hollings Act. That complex litigation included provisions requiring (or authorizing) the Comptroller General to perform certain tasks the Supreme Court decided were executive in nature. An obscure 1921 law gave Congress the power to fire the Comptroller General, though only for "permanent disability," "inefficiency," "neglect of duty," "malfeasance," or "a felony or conduct involving moral turpitude," and then only if both houses of Congress concurred. 31 U.S.C. § 703(e)(1)(B). In the 65 years since it was enacted, this removal power had never been invoked and it was entirely speculative that it ever would be exercised.[18] Despite that, the Court cited the removal power in concluding that the Comptroller General was part of the Legislative Branch, hence Congress had impermissibly assigned to him duties of an Executive nature.

The same reasoning applies here. Our separation of powers jurisprudence does not rest upon presumptions of voluntary restraint by those in power. Madison warned that "a mere demarcation on parchment of the constitutional limits of the several departments, is not a sufficient guard against those encroachments which lead to a tyrannical concentration of all the powers of government in the same hands." THE FEDERALIST No. 48 (J. Madison), p. 313. Rather,

Ambition must be made to counteract ambition .... It may be a reflection on human nature, that such devices should be necessary to control the abuses of government. But what is government itself, but the greatest of all reflections on human nature? If men were angels, no government would be necessary. If angels were to govern men, neither external nor internal controls on government would be necessary.

THE FEDERALIST No. 51, p. 322.

■ Separation of powers challenges differ from most other matters before the court, because they rest upon abstract grand concepts instead of the discrete, concrete injuries that courts usually address. The analysis is largely prospective (how might this play out) rather than retrospective (did the blue car run the red light?). In separation of powers cases, the person challenging the law or action is vindicating not only his own rights, but also the rights of a third party—*i.e.*, a branch of government. That branch, in turn, often is not a party to the case and may even favor the challenged statute. For instance, Congress might eagerly agree to assign some of its less pleasant (or politically perilous) duties to the President, who in turn might welcome this increase in his own powers. Regardless, the court's duty is to uphold the constitutional framework, even in cases where the affected Branches might prefer otherwise.

This dynamic is aptly illustrated by *Commodity Futures Trading Commission v. Schor,* 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986). Justice O'Connor's opinion for the Court distinguishes between constitutional provisions that serve to protect primarily "personal" interests, versus provisions primarily intended to protect "structural" interests. *Id.* at 848, 106 S.Ct. 3245. The parties may waive the former, but not the latter. "To the extent that this structural principle is implicated

---

**18.** The Court also cited a few other reasons for concluding that the Comptroller General was a legislative branch official, but the 1921 law was central to that discussion.

in a given case, the parties cannot by consent cure the constitutional difficulty for the same reason that the parties by consent cannot confer on federal courts subject-matter jurisdiction beyond the limitations imposed by Article III, § 2." *Id.* at 850–51, 106 S.Ct. 3245.

In *Schor*, customers of a commodities broker filed claims, which the CFTC was authorized by statute to resolve. The broker filed common law counterclaims against those customers. The agency heard and decided both sets of claims, and found in favor of the broker. The customers then argued for the first time that the agency lacked jurisdiction to adjudicate the broker's state law counterclaims. Although both sides had implicitly consented to the agency exercising jurisdiction over the counterclaims—indeed, the customers had even urged the broker to assert the claims in the agency forum rather than in a court—the Court deemed that consent ineffective, and reached the merits of the jurisdictional issue anyway.

Notably, there was no guarantee that the customers would achieve a more favorable result if the counterclaims were adjudicated by a court instead of the agency. Nevertheless, the Court did not suggest that the customers lacked standing to mount this challenge.

Here, there is no guarantee that Defendant will receive a lighter sentence if the Guidelines are declared unconstitutional. Under an indeterminate sentencing regime, I could decide to impose a sentence either higher or lower than the Guidelines would require. Still, Defendant has standing to challenge the Guidelines, in hopes of gaining a lower sentence if he prevails. Defendant need not establish that a lower sentence is certain to result, but only that he might receive a more favorable sentence than if sentenced under the Guidelines, which now expressly preclude this court from granting him a downward de-

parture. *Cf. Schor, supra; Lewis v. Casey,* 518 U.S. 343, 353 n. 3, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (inmate alleging denial of access to courts did not have to prove he would have prevailed in the underlying case, but only that he would have presented a non-frivolous claim; "[d]epriving someone of an arguable (though not yet established) claim inflicts actual injury because it deprives him of something of value"); *Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (claim for deprivation of due process does not require proof that plaintiff would have prevailed if he had received a timely hearing).

Besides, if the Guidelines are unconstitutional, Defendant cannot consent to be sentenced under them even if he desires such a result. *Cf. Schor,* 478 U.S. at 850–51, 106 S.Ct. 3245.

This also disposes of the Government's contention that Defendant has sustained no injury because he can't point to any newly enacted Guideline provision that adversely impacts him, which resulted from the change in composition of the Sentencing Commission. "Being sentenced pursuant to an invalid system … presents an 'actual, concrete invasion of a legally protected interest' in every meaningful sense of the phrase." *United States v. Schnepper,* 302 F.Supp.2d 1170, 1187 (D.Hawai'i 2004) (citations omitted). If the Feeney Amendment "causes or exacerbates a violation of the principle of separation of powers …. no defendant, irrespective of the nature or date of the underlying offense, may be sentenced pursuant to the Guidelines Manual." *Id.* at 1188.

It also is immaterial whether this particular Defendant ultimately receives the third point for acceptance of responsibility. The mere fact that the prosecutor can, if he or she chooses, deny a defendant the third point alters the relative bargaining

strength of the parties. A defendant may feel pressured into accepting a less favorable plea, or foregoing discovery or motions, for fear of antagonizing the prosecutor and losing the third point. That, in itself, is sufficient injury to confer standing in this instance.

### G. *Remedy*

██ Having determined that the Guidelines system is unconstitutional, I must determine the proper remedy. Defendant requests that I invalidate the Feeney Amendment and pass sentence under the pre-Feeney Guidelines. That will not do.

The separation of powers issue addressed in this opinion is not a mere challenge to one particular guideline, that can be stricken without disturbing the Guidelines system as a whole. Either the Sentencing Guidelines scheme as it exists today is constitutional, or it is not. There is no middle ground.

Nor, as defendant suggests, can I simply strike down the Feeney Amendment and order the President to ignore the will of Congress and revert to the pre-Feeney version of the governing statutes. Section 2 of the PROTECT Act contains a standard severability clause:

> If any provision of this Act, or the application of such provision to any person or circumstance, is held invalid, the remainder of this Act, and the application of such provision to other persons not similarly situated or to other circumstances, shall not be affected by such invalidation.

Pub.L. No. 108–21, § 2, 117 Stat. at 651.

However, the issue presented here is not the constitutionality of "this Act"—which is a smorgasbord of unrelated provisions stuffed into a single bill for political reasons—but the constitutionality of the Guidelines sentencing scheme itself. The challenged provisions go to the heart of what the Sentencing Commission is today, and whether the present federal Guidelines system, as it has been constructed by Congress, passes constitutional muster. I cannot unilaterally alter the structure of the Sentencing Commission to bring it into compliance with the Constitution. Only Congress potentially has that power.

Accordingly, the only appropriate remedy here is to declare the federal Sentencing Guidelines system, in its present form, unconstitutional. I will sentence Defendant to a term within the minimum and maximum terms prescribed by statute, as I would have done prior to enactment of the Guidelines. I will consider the Guidelines when imposing sentence, but they are now just advisory guidelines, not binding mandates.

### Conclusion

Defendant's motion (# 38) to declare the Feeney Amendment unconstitutional and to impose sentence under the pre-Feeney version of the federal Sentencing Guidelines is granted in part, and denied in part. The federal Sentencing Guidelines system is unconstitutional because it violates the separation of powers doctrine. The defects are not severable. This court will construe the federal Sentencing Guidelines as advisory guidelines, not binding mandates, when imposing sentence in this and all future cases. A presentence report shall be prepared in the usual manner.